**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 03-4899**

———————————

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

          versus

MACY WALKER MCLEAN,

                                        Defendant - Appellant.

———————————

**No. 03-4922**

———————————

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

          versus

PAUL ZIMMERMAN,

                                        Defendant - Appellant.

———————————

**No. 03-4923**

———————————

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

          versus

JAMES EDWARD MCLEAN, JR.,

Defendant - Appellant.

_____

**No. 04-4038**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DEBBIE ZIMMERMAN,

Defendant - Appellant.

_____

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Lacy H. Thornburg, District Judge. (CR-02-156-T)

_____

Argued: February 2, 2005                    Decided: May 2, 2005

_____

Before MOTZ, TRAXLER, and SHEDD, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

_____

**ARGUED:** Lawrence Wilson Hewitt, JAMES, MCELROY & DIEHL, P.A., Charlotte, North Carolina; Claire J. Rauscher, Charlotte, North Carolina; Trevor Michael Fuller, Charlotte, North Carolina, for Appellants. Michael E. Savage, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Preston O. Odom, III, JAMES, MCELROY & DIEHL, P.A., Charlotte, North Carolina, for Appellant James E. McLean, Jr.; Danielle B. Obiorah, MASON-WATSON, OBIORAH & SINGLETARY, Charlotte, North Carolina, for Appellant Debbie

2

Zimmerman.  Gretchen C. F. Shappert, United States Attorney, Jennifer Marie Hoefling, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

—————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Defendants were convicted of various charges related to a mortgage company's scheme to defraud the Federal National Mortgage Association ("Fannie Mae") and the Government National Mortgage Association ("Ginnie Mae"). Defendants raise several challenges to their convictions and sentences. We affirm their convictions, but we vacate their sentences in light of United States v. Booker, 125 S. Ct. 738 (2005), and remand for resentencing.

## I.

Defendants James and Macy McLean were officers and owners of First Beneficial Mortgage Corp ("FBMC"), a mortgage company based in North Carolina. As a qualified Federal Housing Administration ("FHA") lender with direct endorsement authority, FBMC had the authority to approve mortgage loans for federal FHA insurance. An FHA-insured mortgage loan, in turn, is "readily saleable" on the secondary mortgage market. FBMC was also an approved Fannie Mae lender, meaning FBMC could originate a mortgage loan with the borrower and then Fannie Mae would immediately buy the mortgage on the secondary market without doing its own underwriting evaluation.

FBMC created a subsidiary company, First Beneficial Homes ("FBH"), which was in the business of building modular homes financed by FBMC. Paul and Debbie Zimmerman, both of whom were employed by FBMC, were officers in FBH, as was Macy McLean. In order to obtain funds for FBH to build homes, the McLeans,

4

Zimmermans and a third couple, the Greens, recruited individuals, primarily friends and relatives, to sign mortgage loan notes purporting to secure funds advanced by FBMC for homes that, in fact, did not exist or were owned by someone other than the "borrower" named on the note. The McLeans and Zimmermans induced these individuals to sign the mortgage notes by paying them various amounts to participate in an "investment" opportunity and representing that, by signing, the "investors" did not actually incur any repayment obligation. The McLeans and Zimmermans also signed similar fictitious mortgage notes themselves. None of the individuals signing these documents ever acquired or possessed any ownership interest in the properties listed on the notes.

FBMC would then sell these "instruments" to Fannie Mae on the secondary market, representing by the terms of the note that the borrower signing the note had an ownership interest in the listed property, that FBMC had a security interest in the property, and that the property was of sufficient value to protect the lender -- or any secondary purchaser of the loan such as Fannie Mae -- in the event of default. As an approved Fannie Mae lender, FBMC had the authority to transfer its loans to Fannie Mae without having to submit the loans to any underwriting review process by Fannie Mae. Essentially, FBMC was empowered to make underwriting decisions on behalf of Fannie Mae.

Eventually, Fannie Mae detected irregularities in FBMC's underwriting practices and conducted an audit of the loans it had purchased. A physical inspection of the properties for which FBMC had purportedly financed the purchase of a completed home revealed that the many of the lots were either vacant or contained a partially completed house. Additionally, some of the lots that ostensibly secured mortgage loans already purchased by Fannie Mae were being offered for sale. James McLean claimed that he incorrectly assumed that Fannie Mae would purchase construction loans, which disburse funds in piecemeal fashion as each new phase of construction begins. Fannie Mae, however, does not purchase construction loans, which FBMC was not authorized to sell. And, FBMC had not sold the loans as construction loans to Fannie Mae in any event. In November 1998, when FBMC could not account for all of the irregularities, Fannie Mae suspended FBMC as an approved lender.

Faced with the collapse of the Fannie Mae scheme, James McLean agreed to repurchase the loans FBMC sold to Fannie Mae. Although he told Fannie Mae that he had secured investors willing to fund the repurchase of these loans, he refused to divulge the identity of the investors. In fact, FBMC secured funds to repurchase the loans by simply continuing the Fannie Mae "investor" scheme with Ginnie Mae. Ginnie Mae, which is owned by HUD, sells mortgage-backed securities which are created from "pools" of

6

mortgage loans. A qualified mortgage lender originates several FHA-insured mortgages, "pools" them together, and sells them -- without any review -- to Ginnie Mae. Ginnie Mae, in turn, sells an interest in the mortgage pool to investors. FBMC was qualified as a Ginnie Mae lender and issuer, meaning that not only did Ginnie Mae implicitly approve of any mortgage loan extended by FBMC, but FBMC could actually issue Ginnie Mae securities.

The McLeans and Zimmermans used the same lots and "investor scheme" with Ginnie Mae that they had used for Fannie Mae, and the overall process was essentially the same. James McLean paid a commission to the Zimmermans for each "investor" they recruited. The Zimmermans brought their investors to Macy McLean. Macy then gave her assistant these names, along with an address and a purported loan amount, which the assistant inserted into a mortgage note. Ginnie Mae would not accept mortgage loans that were not federally insured, so one of FBMC's loan officers was directed to "supply" an FHA number for the note. The mortgage notes were then signed by the "investors," and, as required by Ginnie Mae, delivered to FBMC's Ginnie Mae document custodian, BB&T bank, for initial certification. James and Macy McLean also had to file certain information electronically. FBMC then issued securities which were sold to Ginnie Mae investors. The purchase price was wired to FBMC's account at BB&T.

7

FBMC also obtained a line of credit at BB&T to fund loans to its customers. As collateral to secure the line of credit, FBMC supplied BB&T with fictitious mortgage notes signed by "investors" who had no ownership interest in the property purportedly secured by the note. Although the line of credit was to be used by FBMC strictly for funding mortgage loans to FBMC clients, FBMC used line of credit money to pay down the fictitious loans sold to Ginnie Mae as well as to repurchase loans from Fannie Mae.

The government's evidence showed that only seven percent of the proceeds from the sale of the fictitious notes to Ginnie Mae went to fund legitimate expenses such as construction and land for FBH's business. One million dollars was allocated to the growing monthly payments on the increasing number of false mortgage notes, and approximately $340,000 was paid out to the Zimmermans and the Greens for commissions. The Zimmermans used structured transactions to deposit half of this into their personal accounts. And $7.5 million of the Ginnie Mae funds were simply transferred to Fannie Mae to repurchase the false notes.

The charges set forth in the 66-count indictment fell into eight groups: wire fraud to sell fraudulent mortgages to Fannie Mae; wire fraud through the transmission of false HUD documents to secure Ginnie Mae mortgage securities; submitting false statements in connection with the Ginnie Mae scheme in violation of 18 U.S.C. § 1001; making false entries on monthly status reports required by

8

HUD in violation of 18 U.S.C. § 1006; making and passing false mortgage notes to influence HUD in violation of 18 U.S.C. § 1010; bank fraud against BB&T in violation of 18 U.S.C. § 1344; money laundering under 18 U.S.C. § 1956; and conspiracy to commit the above-mentioned substantive offenses.

James McLean was convicted on all 66 counts. Macy McLean was convicted on all counts except those relating to the entry of monthly status reports required by HUD in violation of 18 U.S.C. § 1006; and Paul and Debbie Zimmerman were convicted of conspiracy and of passing to HUD false mortgage notes dated after February 1, 2000, in violation of 18 U.S.C. § 1010.

## II.

Defendants raise a number of challenges to the district court's jury instructions. We review both "[t]he decision of whether to give a jury instruction and the content of an instruction . . . for abuse of discretion." United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996). Finding no such abuse of discretion by the district court, we conclude that defendants' arguments are without merit.

## A.

Macy McLean and the Zimmermans argue that the district court abused its discretion in giving the jury a willful blindness (or deliberate avoidance) instruction. The district court gave a lengthy "good faith" instruction, explaining that good faith was a

9

defense that, if proven, was inconsistent with an intent to deceive. As part of the good faith instruction, the court charged: "a defendant also does not act in good faith if the government proves . . . she deliberately closed [her] eyes to what would otherwise have been obvious." J.A. 2010-11.

A willful blindness instruction is proper "when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." See Abbas, 74 F.3d at 513 (internal quotation marks omitted). If the evidence supports such an inference, then the willful blindness instruction "allows the jury to impute the element of knowledge to the defendant." United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). Furthermore, a willful blindness instruction is proper "where the evidence presented in the case supports both actual knowledge on the part of the defendant and deliberate ignorance." Abbas, 74 F.3d at 513. Macy McLean and both Zimmermans claim that they acted in good faith and lacked the requisite guilty knowledge to support a conviction on any of the charges against them. However, while there is clearly evidence that would permit the jury to find actual knowledge, the evidence also supports the conclusion that if they were not specifically aware that they were defrauding the government, they were willfully blind to that fact.

With respect to Macy McLean, she claims that "throughout the trial, she continually contested that she did not knowingly or

10

intentionally attempt to defraud Fannie Mae, Ginnie Mae, or BB&T;" that she did not "knowingly make false entries, [or] false statements;" or that she did not "knowingly launder money" or "aid or abet others in any criminal activity." Brief of Appellants at 29. Specifically, Macy took the position that she had no real input into how FBMC was run, that her husband exercised substantial control over her employment activities, and that she merely followed his directives. The evidence, however, showed that Macy was an officer of FBMC; that she was in charge of payroll and loan funding; that she handled questions from FBMC's document custodian for the Ginnie Mae mortgage notes; that she created the bogus mortgage notes; that she told the "investors" that they would not have to pay money on the notes they signed; that she endorsed the notes over to Fannie Mae; and that she offered a former FBMC employee $5,000 to use her son's name on a mortgage loan.

As for the Zimmermans, they contend there is no evidence that either of them understood how the mortgage transactions worked such that they would know the transactions were improper, and both indicated that they were unaware that the notes being signed by the investors were being submitted to quasi-governmental bodies. We disagree. Evidence of their actual knowledge of the scheme to defraud the government included Paul Zimmerman's testimony that he and his wife heard James McLean say that FBMC was "HUD-supported" and that he understood the mortgage notes that they were having

11

executed bore an FHA number and other FHA markings. It also included the testimony of Eric Brown, who explored the possibility of financing a family-owned real estate venture through FBMC in the early part of 2000. Upon arriving at FBMC for what Brown believed was a preliminary meeting, Debbie Zimmerman presented him with mortgage documents bearing his name and the names of his parents as the purported debtors. Brown testified that Debbie told him he had to sign the notes immediately so the documents could be sent to HUD for processing. When Brown balked at signing and asked if his attorney could review the documents, James McLean explained, with Debbie Zimmerman present, that the scheme was "legal, but . . . not really legal." J.A. 1056. Paul Zimmerman explained to Brown that if they signed, they would have no obligation under the notes, and that FBMC was obtaining its financing through some federal agency. Debbie Zimmerman's brother testified that she approached him, but that he objected when he learned that the note would be used to obtain funds from Fannie Mae.

Additionally, there was evidence from which a jury could have inferred that Macy McLean and the Zimmermans were aware or closed their eyes to the fact that the mortgage notes contained false information; that no houses were being sold in connection with these loans; and that "investors" were receiving money for signing and that they were not going to be obligated under the note. This evidence would support an inference of deliberate ignorance. The

12

district court, therefore, did not err by instructing the jury on willful blindness.

B.

Defendants take exception to the district court's refusal to give a "good faith" instruction on the counts alleging the passing of false mortgage instruments to HUD under § 1010. The court gave a lengthy instruction on "good faith" as a "complete defense" to conspiracy and the court reminded the jury of good faith when instructing on wire fraud, bank fraud, and money laundering. The court, however, refused to give an additional instruction on good faith with respect to the passing of a false mortgage instruments under § 1010.

The statute says:

> Whoever, for the purpose of obtaining any loan . . . from any person . . . with the intent that such loan . . . shall be offered to or accepted by [HUD] for insurance, . . . or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or . . . forges, or counterfeits any instrument, paper, or document, . . . knowing it to have been . . . forged, or counterfeited . . . [is subject to 2 years in prison].

18 U.S.C. § 1010.

Defendants do not challenge the elements as charged by the court. Rather, defendants argue that they were entitled to a good faith instruction because they held a good faith belief that they were participating in a lawful investor program. We disagree. On the knowledge element, the district court charged that the

13

Government was required to prove defendants "knew that the mortgage notes were actually false or counterfeited" and that they "knew [the notes] would be offered for some purpose to HUD."  J.A. 2040-41.  This is consistent with 18 U.S.C. § 1010.  Defendants' desire to have good faith charged does not correspond to the elements of this offense.  As long as defendants knew the information on the documents they procured was false and that the documents were headed to HUD (i.e., Ginnie Mae), defendants' belief that the scheme was lawful, even if true, was not a defense.

Accordingly, we conclude that the district court did not abuse its discretion in refusing to charge good faith in connection with the § 1010 counts.*

III.

Macy McLean next argues that the district court abused its discretion by refusing to permit her to introduce details regarding her children's health problems.  Part of Macy's defense was that she was so busy homeschooling her six children and caring for her daughters, who suffer from rickets, that she did not have the time or energy to investigate the propriety of FBMC's activities.  Although the district court refused to permit evidence providing specific details about the children's condition, it allowed general

---

*We also reject, after careful consideration, the related argument by Macy McLean and the Zimmermans that the district court erred in failing to charge the jury that their reliance on the expertise of James McLean was a defense to the charges.

14

testimony that the children suffered physical ailments that added to Macy's family responsibilities. The district court also permitted the name of the girls' medical condition to come in before the jury. Macy contends that the court's refusal to allow this additional evidence hurt her rebuttal of the willful blindness theory -- that she was far too overloaded to notice and purposely ignore wrongdoing.

We disagree. The additional questions proffered by defense counsel did not add much, focusing on the fact that Macy was the one who took the children to the doctor, that all of her time outside of work was taken up with child care, and that her children were sometimes in pain. The excluded details, however, did not change Macy's substantial involvement in the details of the transactions. On the other hand, the possibility of undue prejudice to the prosecution was real. With the prospect of the father being in prison, it would be tempting for a juror to focus on the plight of Macy's six needy children. Thus, we cannot conclude that the district court abused its discretion by excluding the additional details.

IV.

Defendants contend that the evidence presented by the government was so insufficient that it failed to support the jury's finding of guilt on even one of the multiple counts of conviction. In considering defendants' incredibly broad argument, we will

15

affirm the jury's verdict "if there is substantial evidence, taking the view most favorable to the government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). All that is really necessary is that the evidentiary basis be sufficient to permit "a reasonable trier of fact [to] have found the defendant guilty beyond a reasonable doubt." United States v. Rahman, 83 F.3d 89, 93 (4th Cir. 1996). Having carefully reviewed the record evidence in the light most favorable to the government, we conclude that there was ample evidence for a reasonable trier of fact to have found defendants guilty beyond a reasonable doubt on each count of conviction.

V.

For each defendant, the district court increased the base offense level for sentencing according to its determination of the amount of loss under section 2F1.1(b) of the Sentencing Guidelines. Defendants argue that the district court erred in imposing a sentence based on facts not found by the jury, in violation of the Sixth Amendment. See Booker, 125 S. Ct. at 756. Defendants raise this argument for the first time on appeal. We agree with defendants that the district court plainly erred in imposing their sentences. See United States v. Hughes, 2005 WL 628224 (4th Cir. March 16, 2005). Thus, we vacate the sentences and remand for resentencing in light of Booker. In doing so, we note that we have considered each defendant's argument with respect to the

16

application of the guidelines and conclude that the district court committed no error in that regard.  Thus, on remand the district court should consider the guideline range previously determined, as well as other relevant factors set forth in the guidelines and 18 U.S.C. § 3553(a) before imposing sentence.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

17