# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 18, 2005          Decided July 14, 2006

No. 05-5008

UNITED STATES OF AMERICA,
APPELLEE

v.

PROJECT ON GOVERNMENT OVERSIGHT,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00096)

———

*Andrew D. Herman* argued the cause for appellant. With him on the briefs were *Stanley M. Brand* and *Ross A. Nabatoff*.

*Robert M. Loeb*, Attorney, U.S. Department of Justice, argued the cause for appellee United States of America. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Douglas N. Letter*, Litigation Counsel.

Before: GINSBURG, *Chief Judge*, and GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The Project on Government Oversight (POGO), a non-profit organization, appeals from the district court's grant of summary judgment holding it liable for violating 18 U.S.C. § 209(a). That statute prohibits a private party from making a contribution to the salary of an executive branch official "as compensation for his services" as a government employee. The district court found there was no genuine dispute that POGO violated § 209(a) by issuing a check to a Department of Interior economist. We conclude, however, that there was a genuine dispute as to whether POGO issued the check as compensation for the economist's government service. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings.

I

POGO is an organization that "investigates, exposes and seeks to remedy systematic abuses of power, mismanagement, and subservience of the federal Government to special interests." Appellant's Br. 5. In December 1993, POGO began investigating whether oil companies were committing fraud by undervaluing the amount of oil that they extracted from federal and Indian lands, resulting in the underpayment of royalties owed to the United States. Over the next three years, POGO undertook numerous efforts to focus public attention on the issue. On June 9, 1997, after concluding that the government was unlikely to pursue the matter, POGO filed two *qui tam* actions in the United States District Court for the Eastern District of Texas. The actions alleged that major oil companies had violated the False Claims Act, 31 U.S.C. § 3729, by undervaluing the oil they extracted and then underreporting and underpaying the oil royalties they owed.[1] After POGO filed the

---

[1] The False Claims Act imposes a civil penalty and treble damages on any person who, inter alia, "knowingly presents, or causes to be

suit, the United States intervened and entered into settlement agreements that eventually totaled $440 million.

During the course of its investigation, POGO spoke with many people, including Robert A. Berman, a senior economist at the Interior Department. Beginning in 1994, POGO's executive director, Danielle Brian, had between twenty and thirty telephone conversations with Berman in which they discussed oil royalty issues. In 1996, Brian asked Berman whether he wanted to join POGO as a co-relator in the *qui tam* actions that the organization intended to file. *See supra* note 1. Although Berman declined POGO's offer to be a co-relator, he subsequently entered into an agreement with POGO providing that he would receive one-third of any money that POGO recovered through the litigation. *See* J.A. 67. POGO also agreed to give a one-third share to Robert Speir, an economist at the Department of Energy, with whom it also had discussed the issue of oil royalties. *See id.*

After POGO received its $1.2 million share of the first settlement in the *qui tam* actions, POGO attorney Lon Packard informed Kenneth Dodd, the Assistant United States Attorney

---

presented, to an officer or employee of the United States Government[,] . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). Section 3730(b) provides that a "private person[,]" commonly known as a "relator," may bring a civil action for a violation of § 3729 "in the name of the Government." 31 U.S.C. § 3730(b). Such an action is known as a "*qui tam*" suit. The statute permits the government to take over the action and conduct it itself, or to decline to take over the action, in which case the relator has the right to conduct it. *See id.* The relator is entitled to different percentages of any recovery from a successful False Claims Act suit, depending upon whether the relator or the government conducts the action. *See* 31 U.S.C. § 3730(d)(1)-(2); *see generally United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998).

working on the *qui tam* litigation, that POGO intended to give Berman a portion of its recovery. *See* Def. POGO's Statement of Material Facts ¶ 36. Although Dodd informed other officials at the Justice Department of POGO's intention, no one told POGO to abandon its plan to remunerate Berman. *See id.* at ¶ 42. In addition, Berman consulted his government ethics officer to determine whether he could legally accept the proposed payment. *See* Brian Dep. 256 (July 23, 1999). Berman reported to Brian that the ethics officer advised that he could accept it. *See id.* On November 2, 1998, POGO issued a check to Berman in the amount of $383,600. The face of the check indicated that it was a "Public Service Award," and the accompanying letter from POGO explained that it was given to Berman for his "decade-long public-spirited work to expose and stop the oil companies' underpayment of royalties for the production of crude oil on federal and Indian lands." J.A. 73-74.

On January 21, 2003, the Justice Department filed a civil complaint against Berman and POGO charging, inter alia, that the payment and receipt of the $383,600 violated 18 U.S.C. § 209(a). The government moved for summary judgment on the § 209(a) count on April 28, 2003, and POGO cross-moved on June 24, 2003. A year later, on June 22, 2004, the district court convened the parties and told them that the case appeared ill-suited for summary judgment: "Counsel, I have looked over this file and I'll tell you what my inclination at this point is. I do not think that I could grant either [m]otion for [s]ummary judgment." Hr'g Tr. 2 (June 22, 2004). Noting that the case was "fact depend[e]nt," *id.* at 6, the court told the parties: "I'm going to ask you to come back here in two weeks and tell me when you could try the case." *Id.* at 7.

When the parties reconvened two weeks later, however, the district court reversed course. This time, the court told the parties: "I don't like the implications of what it was that Mr.

5

Berman did, and I think that this reaches it. I may be wrong."
Hr'g Tr. 19 (July 9, 2004). On August 31, 2004, the court
granted the government's motion for summary judgment on the
charge that POGO and Berman violated § 209(a). The court's
order contained no explanation, other than that the motion was
granted "for substantially the reasons set forth in Plaintiff's
memorandum in support." *See United States v. Project on Gov't
Oversight*, No. 03-0096, Order at 1 (D.D.C. Aug. 31, 2004). At
the same time, the court certified its order for immediate appeal
pursuant to 28 U.S.C. § 1292(b). *See id.* POGO's appeal is now
before us.[2]

II

We review the district court's grant of summary judgment
de novo. *See Waterhouse v. District of Columbia*, 298 F.3d 989,
991 (D.C. Cir. 2002). Summary judgment is appropriate only if
"'there is no genuine issue as to any material fact and . . . the
moving party is entitled to a judgment as a matter of law.'"
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)
(quoting FED. R. CIV. P. 56(c)). A dispute about a material fact
is genuine "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Id.* at 248. We must
view the evidence in the light most favorable to the nonmoving
party, draw all reasonable inferences in its favor, and eschew
making credibility determinations or weighing the evidence.
*See Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)
(citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150
(2000)).

---

[2]No appeal has been filed by defendant Berman, and the parties
have made no representations regarding his status.

6

A

Section 209(a) provides, in relevant part:

> Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, . . . from any source other than the Government of the United States . . .; or

> Whoever . . . makes any contribution to, or in any way supplements, the salary of any such officer or employee under circumstances which would make its receipt a violation of this subsection --

> Shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 209(a). The referenced section, § 216(a), provides that whoever "engages in the conduct constituting the offense" shall be imprisoned for not more than one year, 18 U.S.C. § 216(a)(1), and that whoever "willfully engages in the conduct constituting the offense" shall be imprisoned for not more than five years, 18 U.S.C. § 216(a)(2). Section 216(b) authorizes the Attorney General to bring a civil action, as he did in this case, against any person who "engages in conduct constituting an offense under section . . . 209," and provides that "upon proof of such conduct by a preponderance of the evidence, such person shall be subject to a civil penalty." 18 U.S.C. § 216(b).

In light of the statutory language, both parties agree that one element of the offense that the government must prove by a preponderance of the evidence is that POGO made a contribution to or supplementation of Berman's salary "as

compensation for his services as an officer or employee" of the United States. 18 U.S.C. § 209(a); *see* Appellee's Br. 14, 15; Appellant's Br. 20, 29-32. As we held in *United States v. Muntain*, "[f]or there to be a violation of § 209, . . . the contribution must have been received as compensation for services and those services must have been rendered as an employee of the United States." 610 F.2d 964, 969 (D.C. Cir. 1979) (internal quotation marks omitted); *accord United States v. Raborn*, 575 F.2d 688, 691-92 (9th Cir. 1978).

Services that a government employee provides other than as part of his official responsibilities do not satisfy this requirement. In *Muntain*, for example, we found that the Assistant to the Secretary for Labor Relations at the Department of Housing and Urban Development (HUD), who functioned as HUD's chief liaison with organized labor and chief spokesman on labor relations matters, did not violate § 209(a) by receiving compensation for promoting a private insurance scheme to labor unions. *See* 610 F.2d at 966, 969-70. In reaching that conclusion, we indicated that the statute is violated if the compensation is "'for the [s]ervices rendered to the Government,'" or if the "'employee renders the same or similar services to both the Government and a private person.'" 610 F.2d at 970 n.5 (quoting 41 Op. Att'y Gen. 217, 220 (1955)). The statute "'does not, however, prohibit payment for services rendered exclusively to private persons or organizations and which have no connection with the services rendered to the Government.'" *Id*. (quoting 41 Op. Att'y Gen. at 220); *see Crandon v. United States*, 494 U.S. 152, 165 (1990) ("'[T]his rule prohibit[s] two payrolls and two paymasters for the same employee on *the same* job.'" (quoting with approval Association of the Bar of the City of New York, Conflict of Interest and Federal Service 211 (1960)) (emphasis added)).

The Department of Justice has itself concluded that § 209 does not "prohibit all non-government payments to an individual where there is any nexus between the payment and the individual's employment by the government." Application of 18 U.S.C. § 209 to Employee-Inventors Who Receive Outside Royalty Payments, Op. Off. Legal Counsel, U.S. Dep't Justice, 2000 WL 33952879 (Sept. 5, 2000) (internal quotation marks omitted). Rather, the statute requires "an intentional, direct link between the outside compensation and the employee's government service." *Id*.[3] The Department's conclusion was based on a 1962 amendment that substituted the "as compensation for" requirement for the previous requirement that the payments be "in connection with" an employee's services to the government. *Id*. As the House Report explained, the amendment was made "in order to emphasize the intent that the prohibition is against private payment made expressly for services rendered to the Government"; Congress regarded the former "in connection with" phrase as too "vague and capable of an indefinitely broad interpretation." H.R. REP. NO. 87-748, at 24-25 (1961).[4]

The district court's grant of summary judgment against POGO can thus be upheld only if there is no genuine dispute that POGO paid Berman as compensation for his services as an Interior Department economist. The government contends that

---

[3]*See also* Summary of the Restriction on Supplementation of Salary, Off. Gov't Ethics 3-4 (2002) ("To make out an offense under section 209, there must be a direct linkage between the thing of value paid to the employee and the official services rendered by the employee.").

[4]The Senate Report stated: "Section 209 is similar to . . . [the former 18 U.S.C. §] 1914. . . . The new language is more precise in expressing what is clearly intended by the present broad phrase." S. REP. NO. 87- 2213, at 14 (1962).

is precisely the case: "POGO paid Mr. Berman *because* of the work he had done for Interior and for his assistance to POGO in connection with that work." Appellee's Br. 8. POGO, however, insists that there is a genuine dispute regarding this point. It gave the award, POGO explains, not as compensation for Berman's government work, but in recognition of whistleblowing that assertedly was outside the scope of that work. *See* Brian Dep. 112 (July 23, 1999).

B

The government offers an array of evidence supporting its contention that POGO paid Berman as compensation for his government service. First, the government proffers evidence regarding the nature of Berman's job at the Interior Department. It cites affidavits, filed by Berman's supervisors at Interior's Office of Policy Analysis, which state that "[d]uring the period from 1993-96, and possibly before, [Berman] was the lead analyst in the office on oil royalty valuation issues," Bettenberg Aff. 2; that his responsibilities included the "policies and procedures used for the collection of royalties on oil and gas leases issued by the Department," Heintz Aff. 1; and that he was "part of an interagency task force dealing with oil valuation issues," *id.* at 2. The government also contends that, when Berman testified before a congressional committee in 1996, he made many of the same allegations that POGO would later make in its *qui tam* complaint.

Second, the government cites testimony by POGO's Danielle Brian which, it argues, shows that the services that led POGO to compensate Berman were the same as those he provided the government. In depositions taken during the *qui tam* litigation, Brian testified that she "considered Mr. Berman an ally and an asset in [the] effort . . . on the oil royalty question." Brian Dep. 71 (July 23, 1999). She conceded that,

before filing the *qui tam* suit, she had roughly twenty to thirty conversations with Berman. *See id.* at 81. Brian said that Berman helped her understand issues relating to the underpayment question, *see id.* at 69, and that he helped her draft a Freedom of Information Act (FOIA) suit for documents in the possession of the government, *see id.* at 72. She also testified that she sought out Berman because he had been one of the "people who had . . . for a decade" tried "to get the government to do something about the underpayment of royalties," *id.* at 112; because he "was known as the only person in the [D]epartment who was really caring about this issue," *id.* at 64; and because he was "a great advocate on this issue internally" within the Department, *id.* at 69. Indeed, she testified that a memorandum written by Berman (apparently in 1986), which was leaked to her by an anonymous source, proved critical to her understanding of the oil royalties scheme. *See id.* at 106-07.

Finally, the government points to further statements by Brian that it regards as express admissions that POGO paid Berman as compensation for his government work. These include minutes of a POGO Board of Directors' meeting that discussed the agreement to pay Berman a portion of the *qui tam* recovery. The minutes stated: "Ms. Brian mentioned that an agreement has been worked out that if there is some reward, . . . the individuals that have been doing this work for years would be *compensated.*" J.A. 53 (emphasis added). The government also cites the letter Brian sent to Berman accompanying the $383,600 check, which said: "We are giving you this check as an award for your decade-long public-spirited work to expose and stop the oil companies' underpayment of royalties." J.A. 73. In addition, a press release that POGO drafted to announce the payments to Berman and Speir described the two as "loyal public servants [who] have played a central role in fixing many serious problems within government," and noted that "it seemed

only fair that the two unsung heros be *compensated* in keeping with the spirit of the False Claims Act." J.A. 111 (emphasis added).

### C

Although the government's evidence is impressive, there is also evidence that contradicts it. First, Berman has stated that his supervisors' depiction of his Interior Department responsibilities is "false." Def. Berman's Mem. in Opp'n to Pl.'s Mot. For Summ. J. & in Supp. of Def. POGO's Cross Mot. for Summ. J., Ex. 9, Berman Decl. ¶ 9. "At no time during [my] tenure," he declared, "did I have any programmatic authority or responsibility over oil pricing policies or royalty collection policies at [Interior]." *Id.* at ¶ 1. Supervisor Theodore Heintz's affidavit was "particularly deceptive," Berman said, in describing his "area of responsibility" as "policies and procedures with respect to the collection of royalties for oil and gas leases issued by the Department." Def. Berman's Counterstatement of Material Facts ¶ 70. Moreover, "[c]ontrary to the assertion contained in [Heintz's] affidavit," he "never served on the Interagency Taskforce . . . on oil prices and oil royalty collection." Berman Decl. ¶ 7.[5]

---

[5]Providing some support for Berman's position is Brian's testimony that Berman "checked with his ethics officer" and was told that he "was allowed to accept the money." Brian Dep. 256 (July 23, 1999). Although "[n]either good faith, nor full disclosure" is a defense to a § 209(a) civil action, *see Crandon*, 494 U.S. at 165, the advice of the Interior Department ethics officer may be evidence that the Department did not view Berman's official work as the same as or similar to that for which he was being rewarded by POGO. And Berman's report to Brian regarding that advice may be seen as evidence confirming POGO's understanding, *see* discussion *infra*, that the work was different.

According to Berman, although he did study oil pricing and royalties collection policies from 1986 to 1987, he did so on his own initiative and, impliedly, not as part of his government responsibilities. *See id.* at ¶ 4. It was during this period that Berman wrote the internal memorandum later obtained by POGO. *See* Def. Berman's Counterstatement of Material Facts ¶¶ 9-10. Thereafter, however, Interior officials told him to stop making suggestions because it "create[d] unnecessary problems," and he "complied with this instruction." Berman Decl. ¶ 5. Following the "rejection of his suggestion[s] in 1987," Berman said, he "ceased his analysis of the oil companies' underpayment of royalties." Def. Berman's Counterstatement of Material Facts ¶ 21. Although Berman's statements are somewhat ambiguous, they suggest that continuing efforts he made to alert his supervisors "about the fraudulent practices" of the oil companies represented an independent undertaking that was not part of his official responsibilities. Berman Decl. ¶ 8.

Second, POGO denies that it compensated Berman for services that it thought were part of his government responsibilities. Supporting this denial is Brian's *qui tam* testimony that she believed "it wasn't [Berman's] job to look into whether . . . royalties had been underpaid by these companies," Brian Dep. 353 (Sept. 13, 1999), and that at the time she discussed a proceeds-sharing agreement with Berman, his government work did not involve the oil royalty issue at all, *id.* at 395. Brian also testified that it was she who suggested that congressional staff call Berman as a witness on the royalty issue, and that he testified against the Interior Department's wishes and position. *See* Brian Dep. 90-91 (July 23, 1999). That, POGO insists, is the meaning of Brian's statement that Berman was one of the "people who had . . . for a decade [tried] to get the government to do something about the underpayment of royalties," *id.* at 112, and that he "was known as the only person

in the [D]epartment who was really caring about this issue," *id*. at 64.

In her depositions, Brian did not dispute that she considered Berman "an ally and an asset" on the royalty issue, Brian Dep. 71 (July 23, 1999), and that he helped her in understanding an issue relating to royalty underpayments, *see* Brian Dep. 342 (Sept. 13, 1999). But she did dispute that Berman's assistance stemmed from his government employment. She testified that about half the calls she made to Berman were to his home, because "this wasn't really a part of what he was working on." Brian Dep. 67 (July 23, 1999). And while Brian acknowledged that Berman helped her draft a FOIA request for government documents, *see id.* at 72, she denied that he leaked inside information to her or that he helped prepare the *qui tam* case, *see id*. at 72-73, 287. Indeed, even if the agreement to divide the *qui tam* proceeds suggests the contrary, not even the government argues that leaking confidential information or helping a plaintiff prepare a FOIA request or *qui tam* complaint were part of Berman's job description.[6]

Finally, POGO argues that the government has taken its statements about compensating Berman out of context. It does not deny that it intended to "compensate" him, but insists that it

---

[6]*Cf.* Def. POGO's Statement of Material Facts 11 (statement by Dodd, the government's lead attorney on the *qui tam* litigation, that Berman "played absolutely no role in my office's, and as I understand it, Commercial Litigation's decision to intervene in these [*qui tam*] cases, an evaluation of the merit of the cases against the oil companies, any settlement or settlement discussions with any of the oil companies or any of the computations of damage analysis that were done"). The civil complaint filed by the government does include other counts against Berman, including "Breach of Fiduciary Duty." Compl. ¶¶ 48-51. Berman is not a party to this appeal, however, and those counts are not at issue here.

neither said nor meant that it compensated him for his government work. Rather, POGO asserts that the "work" for which it compensated Berman, as referenced in the Board minutes, transmittal letter, and draft press release, was work as an internal "whistleblower who went well beyond his official duties to defend the taxpayers' interests." Appellant's Br. 36-37; *see* Brian Dep. 112 (July 23, 1999); Brian Dep. 353 (Sept. 13, 1999).

D

There is no doubt that the government has made out a strong case against POGO, that Berman's declarations lack clarity and contain some internal contradictions, and that Brian's statements provide fodder for potentially damaging cross-examination. POGO may well have an uphill battle in showing that Berman's Interior Department duties did not include the same internal "whistleblowing" for which POGO rewarded him or that POGO did not understand that to be his responsibility when it decided to "compensate" him. But the question before the court is not whether the government has a strong case, or even whether it has established that case by a preponderance of the evidence. At "the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The only question before us is whether there is a genuine dispute that POGO paid Berman as compensation for his services as a government employee.

In light of the evidence reviewed above, we cannot say that no "reasonable jury could return a verdict" for POGO. *Id*. at 248. This is particularly so because much of POGO's defense hinges on the credibility of Berman and Brian. To be sure, that credibility may have been undermined by prior statements and

other evidence. On summary judgment, however, "the court must view the evidence in the light most favorable to the nonmoving party and must not assess witness credibility." *Borgo v. Goldin*, 204 F.3d 251, 254 (D.C. Cir. 2000). Evaluation of the credibility of witnesses must be left to the factfinder, *see Mendes-Silva v. United States*, 980 F.2d 1482, 1488 (D.C. Cir. 1993), and "the need to assess the credibility of witnesses is precisely what places this dispute outside the proper realm of summary judgment." *Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 326 n.8 (D.C. Cir. 1989).

## III

Although the parties raise a host of additional issues, we have no reason to reach them. Because there is a genuine issue of material fact as to whether POGO paid Berman "as compensation for his services as an . . . employee of the executive branch," 18 U.S.C. § 209(a), the district court erred in granting summary judgment in favor of the government. We therefore reverse the court's judgment and remand the matter for further proceedings.

*So ordered.*