# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 5, 2009           Decided August 3, 2010

No. 08-5182

UNITED STATES OF AMERICA,
APPELLEE

v.

PROJECT ON GOVERNMENT OVERSIGHT,
APPELLANT

ROBERT A. BERMAN,
APPELLANT

———

Consolidated with 08-5465, 08-5466

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:03-cv-00096)

———

*Ross A. Nabatoff* argued the cause for appellant/cross-appellee Project on Government Oversight. With him on the briefs were *Stanley M. Brand* and *Andrew D. Herman.*

*Robert A. Berman*, appearing pro se, argued the cause and filed the briefs for appellant.

*Judith Rabinowitz*, Attorney, U.S. Department of Justice, argued the cause for appellee/cross-appellant United States of America. With her on the briefs was *Douglas N. Letter*, Attorney.

Before: GARLAND and GRIFFITH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Opinion filed by *Senior Circuit Judge* EDWARDS concurring in the judgment and concurring in part in the opinion for the Court.

GARLAND, *Circuit Judge*: A non-profit organization gave an Interior Department economist a monetary award for his "public-spirited work [to prevent] oil companies[]" from underpaying the Mineral Management Service for oil extracted from federal lands. The government responded by charging both the organization and the economist with violating 18 U.S.C. § 209(a), which prohibits giving or receiving any contribution to or supplementation of salary "as compensation for [an individual's] services as an officer or employee of the executive branch." 18 U.S.C. § 209(a).

The principal question in this case is whether intent is an essential element of a § 209(a) violation. The government persuaded the district court that intent is not an essential element, and that it is irrelevant whether the defendants intended or knew that the activities for which the employee was paid were part of the employee's official responsibilities. The jury, instructed in accordance with this view, found that the defendants had violated § 209(a). Because we conclude that a defendant's intent to give or receive compensation for

government services is a required element of the offense, we reverse.

I

The Project on Government Oversight (POGO) is a non-profit organization "dedicated to remedying systematic abuses of power, mismanagement, and subservience of the federal government to special interests." POGO Br. 2. On June 9, 1997, POGO filed two qui tam actions in the United States District Court for the Eastern District of Texas. The complaints alleged that major oil companies had violated the False Claims Act, 31 U.S.C. § 3729, by undervaluing the oil they extracted from federal and Indian lands and then underreporting and underpaying the oil royalties they owed to the Mineral Management Service of the U.S. Department of the Interior. After POGO filed suit, the United States intervened and entered into settlements with the oil company defendants that resulted in a recovery of $440 million. *See United States v. Project on Gov't Oversight*, 525 F. Supp. 2d 161, 164 (D.D.C. 2007) (*POGO III*).[1]

During the course of the investigation that led POGO to file the qui tam suits, the organization spoke with many people,

---

[1] Section 3730(b) of the False Claims Act provides that a "private person[,]" commonly known as a "relator," may bring a civil action for a violation of § 3729 "in the name of the Government." 31 U.S.C. § 3730(b). Such an action is known as a "qui tam" suit. The statute permits the government to take over the action and conduct it itself, or to decline to do so, in which case the relator has the right to conduct it. *See id.* The relator is entitled to different percentages of any recovery from a successful False Claims Act suit, depending upon whether the relator or the government conducts the action. *See id.* § 3730(d)(1)-(2).

including Robert A. Berman, a senior economist at the Interior Department.  Beginning in 1994, POGO's executive director, Danielle Brian, had between twenty and thirty telephone conversations with Berman in which they discussed oil royalty issues.  Berman helped Brian understand the underpayment question and draft Freedom of Information Act (FOIA) requests for government documents.  In 1996, Brian asked Berman whether he wanted to join as a co-relator in the qui tam actions that POGO intended to file.  *See supra* note 1.  Although Berman declined POGO's offer, he subsequently entered into an agreement with POGO providing that he would receive one-third of any money POGO recovered through the litigation. *See United States v. Project on Gov't Oversight*, 454 F.3d 306, 307 (D.C. Cir. 2006) (*POGO I*).

On November 2, 1998, POGO sent Berman a letter enclosing a $383,600 check.  The face of the check indicated that it was a "Public Service Award," and the accompanying letter explained that POGO was awarding it to Berman for his "decade-long public-spirited work to expose and stop the oil companies' underpayment of royalties for the production of crude oil on federal and Indian lands."  *Id.* (quoting Letter from Danielle Brian to Robert Berman (Nov. 2, 1998)).

On January 21, 2003, the Justice Department filed a civil complaint charging, inter alia, that POGO and Berman had violated 18 U.S.C. § 209(a) in connection with the $383,600 payment.  Section 209(a) states, in relevant part:

> Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, . . . from any source other than the Government of the United States . . . ; or

> Whoever . . . makes any contribution to, or in any way supplements, the salary of any such officer or employee under circumstances which would make its receipt a violation of this subsection –
>
> Shall be subject to the penalties set forth in section 216 of this title.

18 U.S.C. § 209(a). Section 216, referenced in the last line above, provides that whoever "engages in the conduct constituting the offense" may be imprisoned for not more than one year, and that whoever does so "willfully" may be imprisoned for not more than five years. *Id.* § 216(a)(1), (2). The section also authorizes the Attorney General to bring a civil action, as he did in this case, against any person who "engages in conduct constituting an offense under section . . . 209," and provides that "upon proof of such conduct by a preponderance of the evidence, such person shall be subject to a civil penalty." *Id.* § 216(b).

On April 28, 2003, the government moved for summary judgment on the § 209(a) count. Thereafter, the district court granted the government's motion and certified its order for immediate appeal pursuant to 28 U.S.C. § 1292(b). Upon review, this court reversed the district court's order, finding "a genuine dispute as to whether POGO issued the check as compensation for [Berman's] government service." *POGO I*, 454 F.3d at 306.

After the case returned to the district court for trial, the defendants asked the court to instruct the jury that intent to compensate Berman for his services as a government employee was an essential element of a § 209(a) violation. At the government's urging, the court denied the request. The court also denied Berman's motion for summary judgment on the

basis of his contention that § 209(a) does not, as a matter of law, apply to lump-sum (as opposed to periodic) payments.

Trial commenced on February 5, 2008. On February 11, the jury found POGO and Berman liable for violating § 209(a). Thereafter, the district court denied the defendants' post-trial motions for judgment as a matter of law or, in the alternative, for a new trial.

The district court also considered the appropriate penalties under 18 U.S.C. § 216(b), which provides for "a civil penalty of not more than $50,000 for each violation or the amount of compensation which the person received or offered for the prohibited conduct, whichever amount is greater." 18 U.S.C. § 216(b). POGO argued that this section gave the court discretion to impose any penalty up to the value of the $383,600 check that POGO had given Berman; and it asked the court to exercise that discretion to impose no penalty. The government countered that § 216(b) gave the court no discretion at all, but rather required it to impose a penalty of $383,600 on each of the defendants. The court agreed with POGO that it had discretion and, while it assessed a penalty of $383,600 against Berman, it imposed a penalty of only $120,000 against POGO because it found that the organization had given Berman the check in good faith. *United States v. Project on Gov't Oversight*, 543 F. Supp. 2d 55, 69 (D.D.C. 2008) (*POGO VII*).

POGO and Berman now appeal the district court's denial of their post-trial motions, and the government cross-appeals from the court's penalty determination with respect to POGO. In Part II, we consider both defendants' contention that the court erred by refusing to instruct the jury that intent is an element of a violation of § 209(a). Part III addresses Berman's additional contentions including, in particular, his claim that § 209(a) does not apply to lump-sum payments. In Part IV, we examine the

government's challenge to the district court's interpretation of the penalty provision of § 216(b).

II

In light of the plain language of § 209(a), the parties agree that a government employee who receives a payment is not liable unless the payment was received "as compensation for his services as an officer or employee of the executive branch of the United States Government." 18 U.S.C. § 209(a); *see POGO I*, 454 F.3d at 309. "Despite the awkward drafting" of § 209(a)'s two paragraphs, the same is true for a defendant who is a payor: it must make the payment as compensation for government services by the recipient. *Crandon v. United States*, 494 U.S. 152, 159 (1990). Accordingly, the district court instructed the jury that the government must prove that "the payment was as compensation for Mr. Berman's services as an officer or employee of the executive branch of the United States government." Trial Tr. 97 (Feb. 11, 2008).

The defendants, however, asked the court to further instruct the jury that the government had to prove they "*intended* [the payment] as compensation for [Berman's] services as an officer or employee of the United States." Def. [POGO's] Requested Instructions at 27 (Jan. 29, 2008) (emphasis added); *see also* Def. Berman's Special Instruction at 2 (Jan. 30, 2008). This the district court declined to do. Instead, the court told the jury that it could, but was not required to, consider the defendants' intent, and then only for a limited purpose. *See* Trial Tr. 98 (Feb. 11, 2008) (stating that the jury *may* consider intent in determining which particular services POGO paid Berman for).

The court offered two reasons for rejecting the defendants' request to instruct that intent to compensate for government services is an essential element of a § 209(a) violation. First, the

court said, even if the "parties' subjective intent may be relevant to determining *what* [work] the payment was for," it was not relevant to whether the payment was for *government* work. *See POGO VII*, 543 F. Supp. 2d at 62. Second, the court indicated there was a strong argument that § 209(a) contains no intent requirement at all. *Id.* at 63-64. The government pressed both positions below and presses both here.

We take the more absolutist position first and ask: Does § 209(a) contain an intent requirement of any kind? After concluding that proof of intent is required, we proceed to examine the limited intent instruction that the court gave the jury. We review de novo the court's refusal to instruct the jury that intent is an element of the offense. *United States v. Perkins*, 161 F.3d 66, 69 (D.C. Cir. 1998).

A

The government begins its argument for no intent requirement at all by reciting the district court's observation that § 209(a) does not contain the word "intent." Based on a presumption that, "when Congress sought to add such 'intent' elements, it did so clearly and unequivocally," the court concluded that "[t]he choice to omit those terms from § 209(a), then, appears deliberate." *United States v. Project on Gov't Oversight*, 531 F. Supp. 2d 59, 63 (D.D.C. 2008) (*POGO V*); *see* Gov't Br. 12. Accordingly, the court suggested, and the government argues on appeal, that "the defendants' subjective intent was neither an element of the offense nor a relevant defense." Gov't Br. at 9. We disagree.

1. The same language that renders defendants civilly liable under § 209(a) also renders them guilty of a criminal offense, for which they may be "imprisoned for not more than one year." 18

U.S.C. § 216(a)(1).[2]  A long line of Supreme Court cases therefore requires us to reject the presumption relied upon by the government:  contrary to the government's position, the Court has repeatedly stated that the "mere omission . . . of any mention of intent will *not* be construed as eliminating that element from" a criminal offense.  *Morissette v. United States*, 342 U.S. 246, 263 (1952) (emphasis added).[3]  Instead, "offenses that require no *mens rea* generally are disfavored."  *Staples v. United States*, 511 U.S. 600, 606 (1994).[4]  Indeed, even where "the most grammatical reading of the statute" indicates otherwise, the Court has instructed us to read statutes "to include broadly applicable scienter requirements [though] the statute by its terms

---

[2]As we discuss in Part II.A.4, the statute further provides that whoever "*willfully* engages in the conduct constituting the offense" may be imprisoned for not more than five years.  18 U.S.C. § 216(a)(2) (emphasis added).

[3]*See Staples v. United States*, 511 U.S. 600, 605 (1994) ("[S]ilence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal."); *Liparota v. United States*, 471 U.S. 419, 426 (1985) ("[F]ar more than the simple omission of the appropriate phrase . . . is necessary to justify dispensing with an intent requirement." (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978)) (internal quotation mark omitted)); *see also Carter v. United States*, 530 U.S. 255, 269 (2000); *United States v. X-Citement Video*, 513 U.S. 64, 70 (1994).

[4]*See Liparota*, 471 U.S. at 426; *U.S. Gypsum Co.*, 438 U.S. at 437-38; *Morissette*, 342 U.S. at 263; *see also Staples*, 511 U.S. at 605 ("'[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.'" (quoting *U.S. Gypsum Co.*, 438 U.S. at 436)).

does not contain them." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994).[5]

As a consequence, we must not only reject the government's presumption, but adopt the opposite principle: "[W]e must presum[e] that criminal statutes and regulations contain a *mens rea* element unless otherwise clearly intimated in the language or legislative history." *United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008) (internal quotation marks omitted); *see Staples*, 511 U.S. at 606 ("[S]ome indication of congressional intent, express or implied, is required to dispense with *mens rea* as an element of a crime."); *Liparota v. United States*, 471 U.S. 419, 425-26 (1985) (concluding that a statute requires a mens rea element "[a]bsent indication of contrary purpose in the language or legislative history"). Neither we nor the parties have found anything in the legislative history to suggest a legislative purpose to do without an intent requirement. Nor is there any such intimation in the statutory language.

Moreover, although the language of § 209(a) does not include the word "intent," it is not truly silent on the issue. Rather, it includes words that strongly intimate a mens rea requirement. To violate the statute, it is not enough to make or receive a contribution. In addition, that contribution must be made or received "as compensation for" the recipient's services as a government employee. This is the language of intent. To conclude that a payment was made "as compensation," one must determine the intent of the payor. To conclude that a payment

---

[5]The government points to precedent noting that this line of cases does not apply to what the Supreme Court has termed "public welfare" or "regulatory" offenses. As we discuss below, § 209(a) is not such an offense. *See infra* note 15.

was made as compensation "for" something, one must determine what the intended object was.[6]

Indeed, the Supreme Court has drawn much the same conclusion from similar language in the gratuities statute, 18 U.S.C. § 201(c)(1)(A). Like § 209(a), § 201(c)(1)(A) lacks an express scienter term. Instead, it simply proscribes the giving of "anything of value to any public official . . . *for or because of* any official act performed or to be performed." *Id.* (emphasis added). Nonetheless, the Supreme Court has described that language as containing an "intent element," *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999), namely, a "connection between respondent's intent and a specific official act," *id.* at 405. This court has reached the same conclusion. *See United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 966 (D.C. Cir. 1998) ("To satisfy the criminal intent requirement embodied in the phrase 'for or because of any official act,' the giver must intend either to reward some past concrete official act or acts, or to enhance the likelihood of some future act or acts."), *aff'd* 526 U.S. 398 (1999); *see also United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996) (holding that, "to convict for accepting a gratuity[,] the jury need only find that the defendant acted 'knowingly and willingly'" (quoting *United States v. Campbell*, 684 F.2d 141, 149-50 (D.C. Cir. 1982))).

Courts have been particularly concerned to require a showing of intent where "necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Carter v. United States*, 530 U.S. 255, 269 (2000) (quoting *X-Citement Video*, 513 U.S. at 72); *see also Sun-Diamond*, 526 U.S. at 406-07

---

[6]Similarly, to conclude that a payment was received "as compensation for" something, one must determine the intent of the recipient.

(interpreting the gratuities statute narrowly so as not to produce the "peculiar result[]" of criminalizing such conduct as giving the President a jersey for receiving a sports team at the White House or giving a cabinet secretary a school cap for visiting a high school). And there *is* a risk of criminalizing otherwise innocent conduct here. Without the requirement of an intent element, a parent's monthly checks to a child who works for the government could be construed as violating § 209(a): only the parent's *intent* distinguishes payments to help cover the rent from payments to subsidize what the parent regards as an insufficient public-sector salary. The government demurs, saying that "[w]hen parents subsidize their children's low income, most likely they are helping with the rent . . . ; they are not paying for the child's services." Gov't Br. 31. But unless the government envisions instructing the jury as to what is "most likely" as a matter of law, it is only the parent's actual intent that spells the difference between legal and illegal conduct.

To take another example, under the government's theory a publishing company that pays a Justice Department lawyer to write a manual on appellate advocacy on his own time violates § 209(a) if -- unbeknownst to the company -- the Department has assigned the employee to write a similar manual as part of his official duties. *See* Oral Arg. Recording 43:56-44:16 (acknowledgment by government counsel). Indeed, this is so even if the employee lies to the publishing company about the scope of his government work.

An intent element may also be necessary to distinguish between lawful and unlawful public service awards that non-profit organizations bestow on public servants. The Justice Department itself has recognized this point. In 1997, the Department's Office of Legal Counsel (OLC) was asked to determine whether § 209(a) prohibits a non-profit from making payments to grant the wishes of terminally ill children of FBI

agents. Applicability of 18 U.S.C. § 209 to Acceptance by FBI Employees of Benefits Under the "Make a Dream Come True" Program, 21 Op. Off. Legal Counsel 204 (1997), 1997 WL 33100655. "The question before us," OLC said, "is whether there is an *intentional*, direct link between a benefit given under the Program . . . and the FBI employee's services to the government." *Id.* at *2 (emphasis added). Concluding that "private payments to government employees because of their status as employees of the executive branch are not automatically *intended* as compensation for services to the government," OLC ruled that § 209(a) does not bar FBI employees from accepting the payments. *Id.* at *4 (emphasis added).[7] As the U.S. Office of Government Ethics (OGE) has summarized: "[T]he Department of Justice has consistently held that [§ 209(a)] *applies only to payments made with the intent to compensate for Government services* and that the requisite intent may not be inferred from the bestowal upon a public official of a bona fide award for public service or other meritorious achievement." Letter from David H. Martin, Director, OGE, to a Designated Agency Ethics Official (July 26, 1983), 1983 WL 31714, at *1 (citing OLC opinion letters) (emphasis added).[8]

---

[7]*Accord* OLC, Application of 18 U.S.C. § 209 to Employee-Inventors Who Receive Outside Royalty Payments (Sept. 7, 2000), 2000 WL 33952879, at *3 (concluding that § 209 does not bar government employee-inventors from receiving outside royalties because there is "no *intentional*, direct link between an employee-inventor's government services and the licensing of patent rights" (emphasis added)); *see also* 41 Op. Att'y Gen. 217, 217, 220-21 (1955) (concluding that "whether a payment to an officer or employee" violates the statute "is often a matter of ascertaining *the intent* of both the payor and the payee" (emphasis added)).

[8]*Accord* OGE Memorandum to Designated Agency Ethics Officials Regarding 18 U.S.C. § 209 Guidance (July 1, 2002), 2002 WL 32100961, at *9 (reaffirming that "an intent to compensate for

We agree with the government that we are not required to defer to the views of the Justice Department's Office of Legal Counsel. Gov't Br. 35-36. But nothing bars us from regarding OLC's views as more persuasive than those expressed in the Department's appellate brief.

2. The government contends that several statements in the Supreme Court's opinion in *Crandon* indicate that intent is not an element of § 209(a). *Crandon* did not involve the issue we have here, but rather the question of whether § 209(a) applies to payments that a company makes to its departing employees before they enter government service. In the course of holding that such payments are not covered, the Court stated that "[n]either good faith, nor full disclosure, nor exemplary performance of public office will excuse the making or receipt of a prohibited payment." 494 U.S. at 165. Relying on this statement, the government contends that because good faith is not a defense to a § 209(a) violation, there is no intent element to the offense: "[I]f good faith is not a defense, intent (i.e., the absence of good faith) cannot be an element of the offense." Gov't Br. 22.

The problem with the government's argument is its premise: that "intent" is "the absence of good faith." It is true that some kinds of heightened mens rea may involve the absence of good faith (i.e., the presence of bad faith). Accordingly, for crimes that involve those kinds of more culpable mens rea, good faith may constitute an excuse or defense. This is true, for example, of crimes that require that the defendant act "fraudulently" or "corruptly," and is sometimes true of crimes

Government services cannot be inferred from a bona fide award for public service" (internal quotation marks omitted)).

that require "specific intent."[9]  It is also sometimes true of crimes that require that the defendant act "willfully."[10]

---

[9]*See, e.g.*, *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 28 (D.C. Cir. 2009) (stating that, because the Lobbying Disclosure Act requires the government to prove the defendant acted "knowingly and corruptly," "good faith mistakes will [not] result in criminal liability"); *United States v. DeFries*, 129 F.3d 1293, 1310 (D.C. Cir. 1997) (holding that the district court erred in failing to instruct that good faith reliance on counsel's advice is a defense to the fraudulent intent required for embezzlement under 29 U.S.C. § 501(c)); *see also United States v. McNair*, 605 F.3d 1152, 1201 n.65 (11th Cir. 2010) (holding that "a finding of specific intent to defraud necessarily excludes a finding of good faith"); *United States v. Kay*, 513 F.3d 432, 454 (5th Cir. 2007) (indicating that a requirement that the defendant acted "corruptly" would be inconsistent with "good faith"); *United States v. Khorozian*, 333 F.3d 498, 508 (3d Cir. 2003) (holding that "good faith is a complete defense to fraud charges -- negating specific intent").

[10]*See Bryan v. United States*, 524 U.S. 184, 191 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'  In other words, in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." (internal quotation marks omitted)); *Ratzlaf v. United States*, 510 U.S. 135, 137, 142 n.10 (1994) (holding that, "[t]o establish that a defendant 'willfully violat[ed]' the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful," and stating that "[s]pecific intent to commit the crime[s] . . . might be negated by, *e.g.*, proof that defendant relied in good faith on advice of counsel" (internal quotation marks omitted)); *Cheek v. United States*, 498 U.S. 192, 202 (1991) (holding that proof of willfulness in criminal tax cases "requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating" the law); *United States v. Bishop*, 412 U.S. 346, 361 (1973) (holding that "[t]he requirement of an offense committed 'willfully' is not met . . . if a taxpayer has relied

16

But crimes requiring only a more basic level of intent do not require that the defendant act in bad faith. As the Court explained in *Carter v. United States*, a general intent crime requires only that the perpetrator "kn[ow] that [his act] ha[s] the characteristics bringing it within the scope of the statute," not that those characteristics make the acts unlawful. 530 U.S. at 269. Accordingly, for such crimes, good faith is generally not a defense -- notwithstanding that intent to do the things that constitute elements of the offense is required. *See id.* at 269-70.[11] In short, *Crandon*'s observation that good faith will not

in good faith on a prior decision of this Court"); *United States v. Hansen*, 772 F.2d 940, 947 (D.C. Cir. 1985) (holding that good faith is a defense to "the willful filing of false statements" under 18 U.S.C. § 1001). *But see United States v. George*, 386 F.3d 383, 393 (2d Cir. 2004) (noting that "the Second Circuit has held that the term 'willfully' in criminal statutes typically does not require the government to prove the defendant's specific intent to violate the particular criminal statute in question").

[11]*See, e.g.*, *United States v. McLean*, 131 F. App'x 34 (4th Cir. 2005) (holding that a "good faith" belief that the defendants were participating in a lawful investor program was not a defense to a charge of knowingly passing false mortgage instruments); *United States v. Preciado-Hernandez*, No. 91-10086, 1992 WL 46682, at *1 (9th Cir. Mar. 12, 1992) (noting "that good faith [i]s not a defense to a general intent crime"); *United States v. Champegnie*, 925 F.2d 54, 55 (2d Cir. 1991) (holding that because "the government need not show that a defendant specifically intended to disobey the law in order to prove a violation" of 8 U.S.C. § 1326 -- which makes it a felony for a previously deported alien to reenter the United States without the express permission of the Attorney General -- the defendant's "good faith or mistaken belief . . . that she could reenter lawfully is not a defense"); *see also Liparota*, 471 U.S. at 425 n.9 (noting that, although it is "a defense to a charge of knowing receipt of stolen goods that one did not know that the goods were stolen," it is not a defense "that one did not know that such receipt was illegal").

excuse the making of a payment prohibited by § 209 means nothing more than that § 209 does not require proof of heightened intent. It does not mean that it has no intent element at all.[12]

The government also calls our attention to *Crandon*'s statement that, "[w]hile some sections focus on bribes or compensation offered as a *quid pro quo* for Government acts, . . . § 209 is a prophylactic rule that aims at the source of Government employees' compensation." *Crandon*, 494 U.S. at 159. A "prophylactic" rule, the government maintains, is one that bars conduct regardless of intent. But *Crandon* did not say that. As the quoted excerpt indicates, *Crandon* merely distinguished provisions like the bribery statute (18 U.S.C. § 201), which requires that the offending payment be made as a quid pro quo -- that is, as a payment "to influence" an official act -- from § 209, which bars a non-government source from paying for an employee's government services regardless of whether the source seeks to influence the employee to do anything in exchange.

Later in *Crandon*, the Court repeated its characterization of § 209 as a "prophylactic" rule, "intended to prevent even the appearance of wrongdoing and that may apply to conduct that has caused no actual injury to the United States." *Id.* at 164. In the context of the Court's prior statement, this again appears to be a reference to the fact that § 209 proscribes payments made

---

[12]We note that *Crandon* was decided under the pre-1989 version of § 209(a). That version did not contain the current cross-reference to § 216(b), which was enacted in 1989 and now makes a "willful" violation of § 209(a) a felony. *See* 18 U.S.C. §§ 209, 216(b); Ethics Reform Act of 1989, Pub. L. No. 101-194, tit. IV, § 407, 103 Stat. 1716, 1753. Thus, *Crandon* does not determine whether good faith is a defense to a felony violation under current law.

as compensation for government services because such payments may create the appearance of wrongdoing, even if they cause no actual injury by changing the recipient's behavior. Of course, the section would be even more "prophylactic" if it covered payments to a government employee regardless of the intent with which they are made. But *Crandon* goes on to instruct that "it is . . . appropriate, in a case that raises questions about the scope of the prohibition, to identify the specific policies that the provision serves." *Id.* at 165. Here, the best way to determine the specific policies that § 209 serves is to read the statutory text -- which is aimed at payments made "as compensation for" government services, not at all payments to government employees.

In a similar vein, the government maintains that the Court's opinion in *Sun-Diamond* also signaled that § 209 has no intent requirement, by stating that § 209 "criminalizes the giving or receiving of any 'supplementation' of an Executive official's salary, without regard to the purpose of the payment." *Sun-Diamond*, 526 U.S. at 409. But this statement, too, must be read in context. In *Sun-Diamond*, the Court faced the question of whether the gratuities statute requires the government to prove that a payment was made merely "because of the recipient's official position," *id.* at 400, or rather "because of some particular official act," *id.* at 406. The Court chose the latter interpretation, in part because § 209 already criminalizes the former: it "refus[ed] to read § 201(c)(1)(A) as a prohibition of gifts given *by reason of the donee's office*" because in § 209(a) Congress had "done so in a more precise and more administrable fashion," *id.* at 408 (emphasis added). This makes the Court's point clear: intent to compensate "by reason of the donee's office" *is* required for § 209(a); a purpose to reward "some particular official act" is not.

3. The government insists, and the district court ruled, that even if there is a general presumption that criminal statutes contain a mens rea element, the opposite presumption should govern for federal conflict-of-interest statutes because "[w]hen Congress sought to require *mens rea* elements [in such] statutes, it did so clearly and unequivocally." *POGO VII*, 543 F. Supp. 2d at 63. But while it is true that some federal conflicts statutes contain express mens rea elements, others do not. And it is decidedly not true that "the courts have refused to read a *scienter* requirement into [such] statute[s] where none exists." Gov't Br. 12. Indeed, the principal cases cited by the government stand for the opposite proposition.

The first case the government cites is *Sun-Diamond*. But as we have already noted, *Sun-Diamond* held that intent *is* required to violate the gratuities statute, 18 U.S.C. § 201(c)(1)(A), notwithstanding that it is a conflicts statute that contains no express mens rea term. *See Sun-Diamond*, 526 U.S. at 404-05; discussion *supra* Part II.A.1. Far from suggesting that conflicts statutes should be read broadly, the Court declared that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." 526 U.S. at 412.

Nor did this court refuse to read a scienter requirement into 18 U.S.C. § 203(a) in *United States v. Baird*, 29 F.3d 647 (D.C. Cir. 1994), although it did refuse to find the specific kind of scienter requirement the defendant wanted. Like § 209, at the time § 203(a) contained no express scienter term; it simply barred government employees from receiving "any compensation for any services rendered" in relation to a proceeding in which the United States is a party. *Id.* at 649 (citing the 1982 version of § 203(a)). Although the court rejected the defendant's contention that the section required proof that he knew he committed a crime, it found it sufficient

that the trial judge had required the government to prove the defendant "knew the facts that made the conduct criminal." *Id.* at 652.

Finally, we simply do not understand how the government can describe *United States v. Nofziger*, 878 F.2d 442 (D.C. Cir. 1989), as an example of a case in which we "refused to read a *scienter* requirement into a [conflicts] statute where none exists." Gov't Br. 12. In the first place, the statute at issue in *Nofziger*, 18 U.S.C. § 207(c) (1982) -- which barred covered former government officials from making certain contacts with their former agencies -- did contain a scienter requirement: it required that the defendant act "knowingly." The problem presented in *Nofziger* was that the statutory language was ambiguous as to whether that requirement applied to *all* of the facts necessary to constitute the offense. *See* 878 F.2d at 443, 452. Rejecting the government's claim that the presumption of mens rea should not apply, this court reversed the defendant's conviction because the jury had not been required to find "that he had knowledge of each element of the offenses charged." *Id.* at 454. In so doing, we reaffirmed "that absent evidence of a contrary legislative intent, courts should presume *mens rea* is required," *id*. at 452 -- even in the context of a conflict-of-interest statute. *See id.* at 453-54.

4. We are also unpersuaded by the district court's view that "[t]he careful distinctions drawn between §§ 216(a)(1) and (a)(2)" -- the penalty provisions applicable to § 209 -- "reinforce the conclusion that the omission of mens rea terms in § 209(a) was deliberate." *POGO VII*, 543 F. Supp. 2d at 64. Section 216(a)(1) provides that whoever "engages in the conduct constituting the offense" in § 209(a) may be imprisoned for not more than one year. 18 U.S.C. § 216(a)(1). Section 216(a)(2) provides that whoever "willfully" engages in such conduct may be imprisoned for not more than five years. *Id.* § 216(a)(2).

We do not believe that the fact that it takes "willfulness" to commit a felony means that Congress chose to require no intent at all to commit a misdemeanor.

First, as we have discussed above, "willfulness" may connote a heightened mens rea requirement. *See supra* Part II.A.2 and note 10. And while there is a "presumption in favor of scienter," that presumption does not "not justify reading a specific intent requirement" into a statute where "a general intent requirement suffices to separate wrongful from otherwise innocent conduct." *Carter*, 530 U.S. at 269-70 (internal quotation marks omitted). Thus, Congress may have thought that the "as compensation for" language of § 209(a) was sufficient to impose a general intent requirement for the misdemeanor offense, but that if it wished to require a heightened level of culpability for the felony, it would have to do so expressly.

Second, and perhaps more important, "[t]he careful distinctions drawn between §§ 216(a)(1) and (a)(2)" can tell us little about whether "the omission of mens rea terms *in § 209(a)* was deliberate." *POGO VII*, 543 F. Supp. 2d at 64 (emphasis added). That is because § 216 was enacted in 1989, long after § 209(a) was initially enacted, and did not change its text (except to remove its penalty provision). *See* Ethics Reform Act of 1989, Pub. L. No. 101-194, tit. IV, §§ 406-07, 103 Stat. 1716, 1753. In fact, § 216 is not just the penalty provision for § 209(a); it sets the "punishment for an offense under section[s] 203, 204, 205, 207, 208, *or* 209." 18 U.S.C. § 216(a) (emphasis added). Some of those sections previously included express mens rea terms; some did not; and the 1989 Act did not substantially alter those terms. *Compare* 18 U.S.C. §§ 203, 204, 205, 207, 208, 209 (1988), *with* 18 U.S.C. §§ 203, 204, 205, 207, 208, 209 (2006).

5. In sum, applying the generally applicable presumption that "criminal statutes and regulations contain a *mens rea* element," *Sheehan*, 512 F.3d at 629 (internal quotation marks omitted), as well as the strong textual signal given by the "as compensation for" language in § 209(a), we conclude that intent is a required element of the offense.

B

In addition to suggesting that § 209(a) contains no mens rea requirement at all, the district court proffered a narrower rationale for rejecting the defendants' request for an instruction that intent is an element of the offense. In line with that narrower rationale, the court gave a more limited instruction on the issue. The district court permitted -- but did not require -- the jury to "'consider *what* services POGO subjectively intended the payment to be for, and what [services] Mr. Berman believed that the payment was for.'" Gov't Br. 34 (quoting the district court's jury instructions) (emphasis added). It did not, however, permit the jury to consider "whether the defendants intended the payment to be for Berman's *Government* service." *Id.* This meant, for example, that the jury was permitted to determine whether POGO intended its payment to be compensation for Berman's "internal government memoranda (as the government would have it)," or instead for his "generalized whistleblowing activities (as POGO would have it)." *POGO V*, 531 F. Supp. 2d at 60-61. But it also meant that the jury was not permitted to consider whether POGO knew that either kind of service (and particularly the latter) was actually part of Berman's government duties. *Id.* at 61; Trial Tr. 98-99 (Feb. 11, 2008) (jury instructions).[13]

_____

[13]The district court believed that this Circuit endorsed a similar two-part approach in *United States v. Muntain*, in which we said: "For there to be a violation of § 209, . . . the contribution must have been

In accord with this two-part analysis, the court gave the following instruction:

> *To determine what services POGO's payment was 'for'* you . . . may . . . consider what services POGO subjectively intended the payment to be for, and what Mr. Berman believed that the payment was for, to the extent that you consider those facts to be relevant to your assessment.
>
> *However, in determining whether the services for which POGO paid Mr. Berman were in fact governmental*, you must consider only the objective facts. Whether POGO or Mr. Berman believed those services fell within Mr. Berman's official government responsibilities is not relevant to your determination of whether the services for which Mr. Berman received the payment from POGO were in fact services as a federal employee.

Trial Tr. 98-99 (Feb. 11, 2008) (emphases added). There are two errors in this instruction.

---

received as compensation for services *and* those services must have been rendered as an employee of the United States." 610 F.2d 964, 969 (D.C. Cir. 1979) (internal quotation marks omitted) (emphasis added). But by listing two elements of the offense, we did not mean to distinguish the way in which intent applies to those elements. Indeed, in *Muntain* the government did not dispute that it was required to prove the defendant intended to receive the payment for his government work. To the contrary, the indictment expressly charged him "with violating [§ 209] by having *knowingly* received $800 *as* 'a contribution to, and a supplementation of, the salary he received from the United States Government *as compensation for his services as the Assistant to the Secretary*." *Id.* (emphases added).

First, even if the instruction were otherwise correct, it was error to tell the jury that the defendant's subjective intent was something that it "may . . . consider . . . to the extent that [it] consider[s] those facts to be relevant." *Id.* As we held in Part II.A, intent is an essential element of § 209(a): something that the jury "must find" to hold the defendants liable, not something that it "may consider" in its discretion.

Second, the court was wrong to effectively cut off the key statutory phrase at the word "services." The statute bars payment to an individual as compensation "for his services as an officer or employee of the executive branch." 18 U.S.C. § 209(a). There is no punctuation or other reason to suggest that the phrase should end at "services." This indicates that it is the entire statutory phrase that describes the evil Congress sought to prohibit: payment intended as compensation not just for "services," but for "services as an officer or employee of the executive branch." And as the Supreme Court held in *United States v. X-Citement Video*, "the presumption in favor of a scienter requirement should apply *to each* of the statutory elements that criminalize otherwise innocent conduct." 513 U.S. at 72 (emphasis added) (citing *Morissette* and *Staples*).[14]

---

[14]Based on that presumption, *X-Citement Video* held that 18 U.S.C. § 2252, which makes it a crime to "knowingly transport[] . . . any visual depiction, if . . . the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct," requires proof not only that the defendant knowingly transported the depiction, but also that he knew the depiction was of a minor. *X-Citement Video*, 513 U.S. at 68, 78. Otherwise, the Court said, "we would sweep within the ambit of the statute actors who had no idea that they were even dealing with sexually explicit material." *Id.* at 69. For similar reasons, this court held in *Nofziger* that, to prove a violation of 18 U.S.C. § 207(c), the government had to show not only that the former government official knowingly communicated with his former agency, but that he also knew the agency had "a direct and

In *Staples v. United States*, the Court applied the presumption in just this manner. At issue in *Staples* was the proper construction of the National Firearms Act, which makes it "unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). The Act defines the term "firearm" to include a "machinegun," *id.* § 5845(a)(6), and defines a "machinegun" as any weapon that is fully automatic, *id.* § 5845(b). *See Staples*, 511 U.S. at 602. The question in the case was whether it was sufficient for the government to prove that the weapon was fully automatic and that the defendant knew he possessed it -- or whether it also had to prove that the defendant knew the weapon he possessed was fully automatic. Although the Court noted that "[s]ection 5861(d) is silent concerning the *mens rea* required for a violation," it also declared that "silence on this point by itself does not necessarily suggest that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal." *Id.*

---

substantial interest" in the matter. 878 F.2d at 443 (quoting the statute). Otherwise, we explained, if the "ex-official tries to interest his former agency in a particular project in the mistaken belief that it had no 'direct and substantial interest' in it, he will have committed a felony." *Id.* at 444 (emphasis omitted); *see also Flores-Figueroa v. United States*, 129 S. Ct. 1886, 1888 (2009) (holding that 18 U.S.C. § 1028A(a)(1), which makes it an aggravated crime to "knowingly transfer[] . . . , without lawful authority, a means of identification of another person," requires proof that the defendant not only knowingly transferred something, but that he knew it was "a means of identification" and that it belonged to "another person"); *Liparota*, 471 U.S. at 433 (holding that 7 U.S.C. § 2024(b)(1), which prohibits "knowingly . . . acquir[ing] . . . [food stamps] . . . in any manner not authorized by [law]," requires proof not only that the defendant knew he acquired the stamps, but also that he knew he did so in an unauthorized manner).

at 605. Because "the Government's construction of the statute potentially would impose criminal sanctions on a class of persons whose mental state -- ignorance of the characteristics of weapons in their possession -- makes their actions entirely innocent," *id.* at 614-15, the Court held that the government must prove the defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun," *id.* at 602.[15]

---

[15]The government argued in *Staples* that "this case fits in a line of precedent concerning . . . 'public welfare' or 'regulatory' offenses, in which [the Court has] understood Congress to impose a form of strict criminal liability through statutes that do not require the defendant to know the facts that make his conduct illegal." 511 U.S. at 606. The Court rejected the argument, noting that "[t]ypically, our cases recognizing such offenses involve statutes that regulate potentially harmful or injurious items," *id.* at 607, such as certain narcotics, dangerous devices, toxic waste materials, and hand grenades, *see id.* at 607-08. Section 209 plainly does not fall into this category.

The government further argues here that the *Staples* Court was influenced by the penalty of up to ten years' imprisonment that potentially attached to a violation of § 5861(d). The Court did note that, "[h]istorically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*." *Staples*, 511 U.S. at 616. But the statutory penalty was only the final consideration the Court took into account, and one that merely "confirm[ed]" its reading of the statute. *Id.* Moreover, in describing what it regarded as the "light penalties" that "first defined the concept of the public welfare offense," the Court referred to terms of incarceration shorter than the one year applicable to non-willful violations of § 209(a). *See id.* (citing cases involving small fines or imprisonment of three or six months).

We are guided by the same considerations here. It is not enough for the government merely to prove which services an outside entity intended to compensate a government employee for, and then to prove that those services actually fell within the employee's official responsibilities. Rather, it must also prove that the entity intended to compensate the employee for his government services. Not to require the latter "would impose criminal sanctions on a class of persons whose mental state -- ignorance of the [scope of the employee's duties] -- makes their actions entirely innocent." *Staples*, 511 U.S. at 614-15. As we explained in Part II.A, without requiring proof that a payor intended to compensate for government services, payors who pay for services that they mistakenly think are non-governmental would be caught in the statute's web. Hence, the intent to compensate *for government services* is the fact necessary to "separate wrongful . . . from otherwise innocent conduct," by ensuring that the perpetrator "knew that [his act] had the characteristics bringing it within the scope of the statute." *Carter*, 530 U.S. at 269 (internal quotation marks omitted).[16]

The district court's principal explanation for not permitting the jury to consider the defendants' intent to compensate or receive compensation for government services was that "[n]either POGO's nor Berman's subjective belief or understanding concerning whether Berman's . . . work

---

[16]In *Carter*, the Court construed 18 U.S.C. § 2113(a), which punishes "whoever, by force and violence . . . takes . . . from the person or presence of another any . . . thing of value belonging to, or in the . . . possession of, any bank." *Id.* at 280. Noting that the subsection "contains no explicit *mens rea* requirement of any kind," the Court applied "the presumption in favor of scienter" to "requir[e] proof of general intent," although not of specific intent to steal or purloin. *Id.* at 267-68 (emphasis omitted).

constituted [such services] is relevant to the proper characterization of that work." *POGO VII*, 543 F. Supp. 2d at 62. But even if it were true that POGO's or Berman's understanding is analytically irrelevant to determining *whether* the work Berman did was actually part of his official duty,[17] that does not mean POGO's intent to compensate Berman *for doing* his official duty is not an element of the offense. To the contrary, this analysis merely makes clear that there are two separate statutory elements at work here: (1) the payor must *intend* its payment to compensate for the employee's government work, and (2) the work at issue must *actually be* his government work. Both must be proven for the conduct to come within the ambit of the statute.[18]

The district court's second rationale for restricting the relevance of intent was based on *Crandon*'s statement that § 209(a) is a "'prophylactic rule[ ] . . . intended to prevent even the appearance of wrongdoing . . . that may apply to conduct

[17]Although it may be correct that *POGO*'s understanding of the scope of Berman's government work is not relevant to the jury's determination of what the scope of that work really was, it is not clear that the same is true of *Berman*'s understanding of the scope of his own work -- any more than it would be correct to exclude testimony from Berman's supervisors about their understanding of the nature of his duties. *See* FED. R. EVID. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); FED. R. EVID. 402 (providing that "[a]ll relevant evidence is admissible"). We do not pass on this question, however, as neither POGO nor Berman raises it.

[18]Similarly, (1) the payee must intend to receive the payment as compensation for his government work, and (2) the work at issue must actually be his government work.

that has caused no actual injury to the United States.'" *POGO VII*, 543 F. Supp. 2d at 63 (quoting *Crandon*, 494 U.S. at 164). From this premise, the district court concluded that "Congress drafted § 209(a) to prohibit all private payments in compensation for an employee's government services -- even payments that simply appear to be for an employee's government work." *Id.* (emphasis omitted).

This is an over-reading of *Crandon*. The Supreme Court did declare that § 209(a) is a prophylactic rule. But a rule that bars payments intended to compensate an official for his government work is plainly prophylactic. As we discussed above, such payments are barred because they give the appearance of wrongdoing, even if they do not actually injure the United States in the sense of altering an official's behavior. *See supra* Part II.A.2. *Crandon* said that the purpose of the statute was to prevent the "appearance *of wrongdoing*"; it did not say that the purpose was to bar all payments "that simply appear to be for an employee's government work." There is no indication in either *Crandon* or the statute that the latter was the "wrongdoing" at which the statute was aimed.

We do agree with the district court that *Crandon* made clear that "[n]either good faith, nor full disclosure, nor exemplary performance of public office will excuse the making or receipt *of a prohibited payment*." 494 U.S. at 165 (emphasis added). But as we explained above, this means only that the statute does not require a heightened form of mens rea. *See supra* Part II.A.2. A payment is "prohibited" by § 209(a) if it is intended to compensate an employee for government work. And if a defendant makes such a payment, its good faith is no defense.

C

Finally, the government urges that, even "if error does exist, it is harmless, as the district court admitted evidence of the defendants' subjective intent and allowed them to argue their good faith to the jury." Gov't Br. 13. In fact, the record is quite muddy as to how much (and what kind of) evidence of intent or good faith the court permitted the defendants to introduce or argue. But even if the court had permitted the jury to hear such evidence in full, we could not conclude that this rendered the error nonprejudicial. *See Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 168 (D.C. Cir. 2007) (stating that the civil harmless error rule directs courts to disregard errors that are not prejudicial).

The heart of the defense was that the defendants did not intend the payment to be for Berman's government service. As we explained in *POGO I*:

> The government contend[ed] that . . . 'POGO paid Mr. Berman *because* of the work he had done for Interior and for his assistance to POGO in connection with that work.' Appellee's Br. 8. POGO, however, insist[ed] that . . . [i]t gave the award . . . not as compensation for Berman's government work, but in recognition of whistleblowing that assertedly was outside the scope of that work.

*POGO I*, 454 F.3d at 310. Moreover, while we have held above that to find the defendants liable the jury *must* determine that they intended the payment to be for Berman's government services, the district court instructed the jury that it *need not* consider the defendants' intent at all and *could not* consider whether their intent was to compensate for government services. We cannot conclude that an error of this importance did not

"affect[] the outcome of the district court proceedings." *Muldrow*, 493 F.3d at 168 (internal quotation marks omitted). Accordingly, we must vacate the verdict and remand the case for a new trial.

### III

In addition to his challenge to the intent instruction, Berman raises two further challenges that we address below.

### A

Berman contends that the district court erroneously failed to instruct the jury that a lump-sum payment cannot qualify as unlawful compensation within the meaning of § 209(a). Berman's contention -- which was also the basis of his summary judgment motion -- is that only an award that satisfies an "objective definition of salary" or bears "indicia of salary" can qualify. Berman Br. 12, 15-16; Berman Reply Br. 9. In particular, he maintains that a single, non-periodic payment does not meet this standard. There is no dispute that this case involves only a single payment of $383,600. Thus, if Berman is correct that a lump-sum payment does not fall within § 209(a), the appropriate disposition would not simply be to remand for a new trial, but to direct the dismissal of the case.

Berman's argument would have weight if the statutory text merely barred outside sources from paying federal employees "salaries."[19] But § 209(a) goes considerably further than that. Although it bars the payment of "any salary," the section also bars the payment of "any contribution to or supplementation of

---

[19] *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1031 (10th ed. 1996) (defining "salary" as "fixed compensation paid regularly for services").

salary." 18 U.S.C. § 209(a). The prohibition of a contribution or supplementation plainly goes beyond a salary, and the introductory adjective "any" expands the scope of coverage still further. *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 53 (10th ed. 1996) (defining "any" as "one or some, indiscriminately of whatever kind"); *Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (noting that "the word 'any' has an expansive meaning" (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)) (internal quotation marks omitted)). Moreover, the statute uses the singular "contribution to," not "contribution*s* to," further suggesting that a one-time payment can qualify.

An additional textual problem for Berman's interpretation is presented by subsections (d) and (e) of § 209, which exclude from the coverage of subsection (a) some payments that are typically lump-sum, or at least not periodic. Subsection (d) provides, inter alia, that "[t]his section does not prohibit payment [to] or acceptance of contributions" by employees for certain travel and other expenses incident to attendance at meetings authorized by Title 5. 18 U.S.C. § 209(d); *see* 5 U.S.C. § 4111(a). Similarly, subsection (e) provides that § 209 does not bar the receipt of relocation expenses for certain executive exchanges. 18 U.S.C. § 209(e). If § 209(a) did not cover lump-sum payments in the first place, it would have been unnecessary for Congress to specify these exceptions. *See, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 140 (1994) (declaring that "[j]udges should hesitate" to treat statutory provisions "essentially as surplusage -- as words of no consequence").

Nor do we think it likely that Congress would have wanted to bar small but periodic payments intended to compensate an employee for his government services, but to permit large single -- or irregular -- payments that total a far greater sum. If the statute is intended to prevent the appearance of wrongdoing, as

the Supreme Court has repeatedly declared, it is hard to see why the public would regard the former as worse than the latter.

This court has certainly assumed that § 209(a) prohibits lump-sum payments, *see United States v. Muntain*, 610 F.2d 964, 969 (D.C. Cir. 1979) (declaring that "there can be no dispute that defendant . . . received a contribution from a source outside the Government when he accepted [a one-time payment of $800] for the Ireland trip"), as has the Seventh Circuit, *see United States v. Oberhardt*, 887 F.2d 790, 793-94 (7th Cir. 1989) (holding that the defendant violated § 209 by paying a government employee $200 for an official document). Berman's argument to the contrary rests primarily on the concurring opinion of three justices in *Crandon*, 494 U.S. at 168-69 (Scalia, J., concurring), with which we respectfully disagree for the textual reasons we have just discussed. Berman also relies on a Second Circuit case, *United States v. Alfisi*, which held that payments to an Agriculture Department inspector did not violate § 209(a) because they bore no indicia of salary. 308 F.3d 144, 153 (2d Cir. 2002). Regardless of whether *Alfisi* is correct, the case did not address the relevance of lump-sum payments at all, but rather turned on the fact that the payments were "in cash and off-book." *Id*.

In sum, because § 209(a) bars the payment of a lump-sum as compensation for an employee's government services, the district court committed no error in refusing to instruct the jury to the contrary.

B

Berman also objects to the court's failure to instruct the jury concerning which activities constituted his official government work. In particular, he objects to the court's refusal to instruct that certain of his activities -- his internal

whistleblowing about oil companies' undervaluation of the oil they extracted from federal land -- were outside the scope of his officially assigned duties. But as the district court noted, "[a]ll throughout the summary judgment proceedings, both defendants . . . maintained that the question of the nature and scope of Berman's official government duties was an issue of fact for the jury to decide." *POGO VII*, 543 F. Supp. 2d at 61. The court correctly concluded that "it is for the jury to decide what Berman's official responsibilities were, what he did, and hence whether his conduct constituted government services." *Id.* And the court's instructions were adequate to guide the jury on this issue. *See Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 (D.C. Cir. 1993).

C

For the foregoing reasons, we deny Berman's challenges to the jury instructions.[20]

---

[20]In addition to those challenges, Berman raises a number of arguments that can best be characterized either as evidentiary disputes or as challenges to the sufficiency of the evidence to support the verdict. Because it is not possible to predict what the record will look like after a new trial, there is no reason for us to address those challenges now. Berman also disputes the district court's conclusion, with respect to a separate count of the complaint, "that the same facts that rendered Berman liable under § 209(a) also support a finding that he breached his fiduciary duty to the government." *United States v. Project on Gov't Oversight*, 572 F. Supp. 2d 73, 75-76 (D.D.C. 2008). Because that conclusion appears to have been largely premised on Berman's now-vacated liability under § 209(a), we leave this issue for the court's reconsideration upon remand.

IV

We now turn to the government's cross-appeal, which maintains that the $120,000 penalty the district court imposed on POGO contravenes the statutory penalty provision, 18 U.S.C. § 216(b), because it is less than the amount of POGO's $383,600 payment. Although our decision to vacate the verdict technically makes resolution of this issue unnecessary, we resolve it now because the district court's construction of the provision is final and resolution will avoid the need for yet a third appeal in the event the jury again returns a verdict against the defendants.

The district court imposed a penalty on Berman in the full amount of the payment he received, $383,600, reasoning that "any lesser amount would mean that he still benefitted from the violation of § 209(a)." *POGO VII*, 543 F. Supp. 2d at 69. As for POGO, however, the court imposed a lesser penalty of $120,000, stating that it was "persuaded that the record contains adequate evidence that POGO made this payment openly and in good faith." *Id.*[21] As the court explained:

> Although *Crandon* holds that good faith is no defense to liability under § 209(a), it does not suggest that a Court cannot take good faith into account when considering the appropriate penalty to impose. The penalty of $120,000 reflects POGO's good faith while also recognizing that the payment was ultimately unlawful. It is also a sufficient penalty to deter similar future conduct by POGO or others.

---

[21]This evidence included: "[POGO's] prior disclosure to [the Justice Department of its plan to make the payment], POGO's desire to [issue] a press release concerning the payment, and the appropriate tax filings made by POGO." *POGO VII*, 543 F. Supp. 2d at 69.

*Id.* (footnote omitted).

The government contends, first, that § 216(b) leaves the district court no discretion: it must impose a penalty on each defendant in the full amount of the unlawful payment. Alternatively, the government contends that, even if § 216(b) affords the court discretion, the court abused its discretion in this case.

Our review of the district court's interpretation of § 216(b) is de novo. *United States v. Fonseca*, 435 F.3d 369, 371 (D.C. Cir. 2006). If we conclude that the court properly interpreted the statute to give it discretion regarding the amount of the penalty, we review the court's determination of the specific penalty only for abuse of discretion. *Jankins v. TDC Mgmt. Corp.*, 21 F.3d 436, 445 (D.C. Cir. 1994).

A

Section 216(b) states that a defendant who has violated § 209(a) shall be subject to a civil penalty of:

> not more than $50,000 for each violation or the amount of compensation which the person received or offered for the prohibited conduct, whichever amount is greater.

18 U.S.C. § 216(b). The government maintains that the introductory phrase, "not more than," modifies only "$50,000 for each violation." Thus, in the government's view, the court must impose a penalty of "either (1) not more than $50,000 [per violation] or (2) the amount of illegal compensation, whichever is greater." Gov't Reply Br. 4. In this case, because there was only one violation, the penalty must be the greater of (a) $0 to $50,000 or (b) $383,600. Gov't Br. 53. And because $383,600

is the greater amount, the court may impose nothing less than that. *Id.*

The district court, by contrast, concluded that "not more than" modifies both the $50,000 per violation amount *and* the compensation amount. On this view, the court must impose a penalty of "not more than [1] $50,000 for each violation or [2] the amount of compensation . . . , whichever amount is greater." 18 U.S.C. § 216(b). In this case, that means the penalty must be not more than the greater of $50,000 or $383,600. Because $383,600 is the greater amount, the court may not impose more than that. It may, however, impose less.

We agree with the district court that both "constructions of the statute are plausible and can fairly comport with common usage." *POGO VII*, 543 F. Supp. 2d at 68. We also agree that the court has chosen the better construction of the two.[22]

The government contends that its reading is the "far more natural" one. Gov't Reply Br. 1. We do not see why. To the

---

[22]We note that other courts -- albeit in dicta -- have construed other statutory penalty provisions with nearly identical grammatical constructions in the same way that we construe § 216(b). *See United States v. Rosen*, 296 F. App'x 188, 194 (2d Cir. 2008) (stating that 18 U.S.C. § 1956(a)(2), which provides that a defendant convicted of money laundering shall be fined "not more than $500,000 or twice the value of the [laundered] funds . . . whichever is greater," authorizes a fine of "up to twice the money laundered"; and affirming a fine of $150,000 where twice the money laundered totaled more than $600,000); *United States v. Rasco*, 853 F.2d 501, 503-04 (7th Cir. 1988) (stating that 18 U.S.C. § 215(a) (1988), which provided that a defendant found guilty of certain bribery offenses shall be fined "not more than $5,000 or three times the value of the thing given . . . , whichever is greater," "merely provides for the maximum amount of fine which can be imposed").

contrary, it seems at least somewhat more natural to read the introductory phrase -- "not more than" -- as modifying the next two phrases in the sentence: "$50,000 for each violation" and "the amount of the compensation." On this reading, "not more than" signals the two alternative ceiling amounts that follow: (1) $50,000 per violation; or (2) the amount of compensation. And the final clause, "whichever amount is greater," then provides a rule for deciding which of the two ceiling amounts will govern. In so doing, the final clause ensures that, where the payment is less than $50,000, the court may nonetheless impose a sentence of up to $50,000. But in cases in which the payment is more than $50,000, as it was here, the court may impose a penalty of up to the full amount of the payment.

In comparison, the government's reading seems somewhat less natural, although we agree that § 216(b) is not a model of legislative drafting. In its view, the penalty is either (1) $0 to $50,000 or (2) $383,600 (the amount of compensation here), whichever is greater. Gov't Br. 53. Under this interpretation, the statute instructs the court to compare not two fixed amounts, but rather one range and one fixed number, and then to decide which is "greater." This strikes us as less natural in several respects: it is unusual for a statute to compare a range and a fixed number; the mathematical meaning of "greater" is somewhat ambiguous in reference to a range; and this construction requires viewing a range as an "amount." The latter is required because the final clause directs the choice of "whichever *amount* is greater" -- a point the government obscures by repeatedly using the phrase "whichever is greater" rather than the statutory phrase "whichever *amount* is greater" -- in paraphrasing its preferred construction. *See, e.g.*, Gov't Br. 52-53; Gov't Reply Br. 4, 6.

The government maintains that the district court's (and our own) reading does not "give meaningful effect to the clause,

'whichever is greater.'" Gov't Br. 52. Yet as we have just explained, "whichever amount is greater" provides a rule for deciding which of the two ceiling amounts will govern in a particular case. Perhaps it could be said that the word "or" is alone sufficient to permit the trial court to select the larger of the two ceilings. But in our view, the decision rule would be at least ambiguous if "or" were the only direction; the addition of the final clause eliminates the ambiguity.

The government also insists that its view is "the only construction consistent with the policy" of the statute because "[t]here can be no policy interest in allowing a Government employee to retain unlawful profits." Gov't Reply Br. 6. Although it recognizes that in this case the district court did deprive the government employee of those profits by imposing a penalty in the full amount of the payment, the government worries that our construction would permit a court to impose less than the full amount. And the government cannot perceive any circumstance in which a lesser amount would be justified.

We agree that, in most cases, penalizing the payee less than the amount he was paid would not be justified. But we cannot say that it never would be. It is important to note that the text of § 216(b) does not end with the indented quotation set out at the beginning of this subpart. Rather, the next sentence states:

> The imposition of a civil penalty under this subsection does not preclude any other criminal or civil statutory, common law, or administrative remedy, which is available by law to the United States or any other person.

18 U.S.C. § 216(b). We cannot say, for example, that it would be unjustified for a judge to conclude, in a case in which a defendant had already been subjected to an array of other

criminal and civil remedies -- perhaps exceeding the amount of the payment -- that a further penalty in the full amount was unnecessary. Accordingly, it would have been reasonable for Congress to have left the precise amount of the penalty to the judge's discretion. And unlike the government, we do not detect a general congressional antipathy towards leaving the amount of civil penalties to a trial court's good judgment.

Moreover, not even the government's construction requires the payee to disgorge the full amount of the payment in all cases. Although it does have that effect when the amount of the payment is more than $50,000 (per violation), that is not the case when the payment is less. To the contrary, in that case the government's construction becomes somewhat indeterminant. For example, where the amount of the payment is $25,000, the government's construction would require a penalty of: (1) "$0 - $50,000" or (2) $25,000 -- whichever is greater. Gov't Reply Br. 5. But what is the meaning of "whichever is greater" when one comparator is a range and the other is a fixed number within that range? In its opening brief, the government says that "[t]he only way to give meaningful effect to the clause, 'whichever is greater,' is to construe § 216(b) as giving discretion to impose a penalty *up to* $50,000 when the amount of compensation is equal to or less than that amount." Gov't Br. 14-15 (emphasis added). This seems a sensible way of interpreting the government's own construction, but the consequence is that it would *permit* a court to impose a penalty of less than the $25,000 payment -- thus defeating the government's disgorgement principle. In its reply brief and at oral argument, the government backed away from this interpretation, insisting that its construction requires the court to pick a penalty between $25,000 and $50,000. Gov't Reply Br. 6 n.1; *see* Oral Arg. Recording 54:03-54:19. We have difficulty seeing how the government's construction yields that result, at least without considerable verbal gymnastics.

Finally, whatever the persuasiveness of the government's "disgorgement" rationale for penalizing the payee in the full amount of the payment, it does not apply to the penalty imposed on the payor. The payor has no "ill-gotten gains" to disgorge; to the contrary, it is already out the amount it paid. Yet under the government's construction, POGO as well as Berman must be penalized the full $383,600. This is not to say that the payor should not be penalized. But it is to say that the government has articulated "no sound policy interest" -- or any reason at all -- that Congress might have had for a mandatory doubling of the payor's loss in every case. And that is further support for the proposition that Congress did not intend the construction upon which the government insists.

B

The government argues, in the alternative, that even if § 216(b) gives the district court discretion to impose a penalty in an amount less than the unlawful payment, the court "abused its discretion in considering evidence of POGO's good faith" without "holding a fair hearing to provide the Government with the opportunity to supplement the record" on that issue. Gov't Br. 57-58. We note that the government never expressly sought such a hearing, but rather described to the court the evidence it would proffer if the court were to hold one. U.S. Resp. to [POGO's] Req. that the Court Impose No Penalty Upon the Organization at 6-7 (Feb. 29, 2008). In any event, because we are remanding the case for a new trial, the government will have an opportunity to request a penalty hearing if the jury again finds the defendants liable.

V

The judgment of the district court is reversed in part and affirmed in part. The case is remanded to the district court with

instructions to vacate the jury's verdict and to conduct further proceedings consistent with this opinion.

*So ordered.*

EDWARDS, *Senior Circuit Judge, concurring in the judgment and concurring in part in the opinion*: I concur in the judgment reached by the majority. I also concur in much of the analysis supporting majority opinion. However, I cannot concur in the majority's disposition of the Government's cross-appeal challenging the District Court's construction of 18 U.S.C. § 216(b). I agree that the Government loses on the merits, but I think the issue is much closer than is suggested by the majority opinion.

As the majority opinion properly notes, our review of § 216(b) is *de novo*, so we owe no deference to the District Court's construction of the disputed penalty provision. It is unclear whether the majority means to endorse the District Court's analysis of the disputed statutory provision or merely affirm on other grounds. The latter appears to be the case. In any event, the decision that we reach is far from ironclad.

Section 216(b) provides that a party who violates § 209(a) is subject to a civil penalty of "not more than $50,000 for each violation or the amount of compensation which the person received or offered for the prohibited conduct, whichever amount is greater." 18 U.S.C. § 216(b).

The District Court found that "not more than" modifies both the $50,000 per violation amount *and* the compensation amount. Under this interpretation, a trial judge court may impose a penalty of

[1] *not more than* $50,000 for each violation

   *or*

[2] *not more than* the amount of compensation,

[3] whichever amount is greater.

The Government contends that the phrase "not more than" modifies only "$50,000 for each violation." Under the Government's interpretation, a person "*shall be* subject to a civil penalty" of

[1]   *not more than* $50,000 for each violation

*or*

[2]   the amount of compensation which the person received or offered for the prohibited conduct,

[3]   whichever *amount* is greater.

I agree with the majority and with the District Court that both "constructions of the statute are plausible." *U.S. v. Project on Gov't Oversight*, 543 F. Supp.2d 55, 68 (D.D.C. 2008).

As I see it, the Government is right in its contention that the District Court's construction strains the language of the statute. There are three obvious problems with the District Court's construction. First, the statute says that a person *shall be*, not *may be*, subject to a penalty for statutory violations. However, under the District Court's view, a trial judge has the discretion to impose no penalty. Second, under the District Court's view, the word "*amount*" in the phrase "whichever amount is greater" is rendered meaningless. And, third, the District Court's reading effectively nullifies the entire phrase "whichever amount is greater."

The District Court's construction unavoidably rests on the assumption that "whichever *amount* is greater" refers to *either* (1) "not more than $50,000" *or* (2) "not more than the amount of compensation." However, neither "*not more than* $50,000" nor "*not more than* the amount of compensation" refers to a discernable "amount." Indeed, each range includes the possibility of zero. Furthermore, under the District Court's construction, when a violation is $50,000 or less, "amount of compensation" is irrelevant, since the trial court always retains

discretion to impose a penalty from $0 up to $50,000. When the violation is over $50,000, "not more than $50,000" is irrelevant, since the trial court always retains discretion to impose a penalty from $0 to the amount of the violation. In other words, the possible penalty range for a violation is determined by whether the compensation is above or below $50,000, not by reference to a comparison of two discernable *amounts*. In every case, there is really only one penalty range in play. Given this reality, the Government is not wrong in suggesting that the District Court's approach renders the clause "*whichever amount is greater*" largely superfluous.

Obviously, the Government's position is appealing. If nothing else, it highlights the fact that § 216(b) is not a model of legislative drafting. Nonetheless, as the majority correctly notes, the Government's view of the disputed language is not the only plausible reading of the statute. Under the Government's construction of § 216(b), a penalty must be (1) "not more than $50,000 " *or* (2) "the amount of compensation," "whichever is greater." Under this view, a trial judge would be required to compare a range to a fixed value (the amount of compensation). If compensation is below $50,000, then the penalty may fall between the amount of the violation and $50,000. If the compensation is above $50,000, then the penalty is the amount of the compensation. The penalty can never be zero. This is a plausible construction of the statute, but not more compelling than the competing interpretation adopted by the majority opinion.

The Government's construction is problematic for at least two reasons. First, it is unusual for a statute to compare a range and a fixed number, as the Government would have it. Second, the rigid penalty formulation to which the Government subscribes affords the trial judge no discretion, which seems odd with respect to a statute that includes the words "not more than." And the Government is simply incorrect in suggesting that our

construction of the statute fails to give any effect to the phrase "whichever amount is greater." Our interpretation is not airtight, but this is because the statute is poorly worded.

This is a case in which judges are required to do the best they can in construing a statutory provision that does not admit of a straightforward interpretation. Because I am satisfied that the construction that we endorse is marginally better than the interpretation offered by the Government, I join the result reached by the majority. In a case such as this, marginally better is enough to carry the day.