KAREN LECRAFT HENDERSON, Circuit Judge,
concurring in the judgment:
While I join my colleagues in the judgment affirming the district court, I write separately to set out why I find the result troubling. The principal question before us is whether cochlear implant mapping — i.e., calibrating a cochlear implant so that an individual with profound hearing loss can receive and interpret auditory signals — is an “audiology serviee[ ]” or other “related service[]” that must be provided under the IDEA. See 20 U.S.C. § 1401(26)(A). This, as my colleagues correctly note, is a *792 “close question.” Majority Op. at 780.[1] That said, I agree with them that the “meaning of ‘audiology services’ as used in the IDEA’S ‘related services’ provision is ambiguous as to whether it encompasses the full panoply of services that might be described as audiology services in other contexts,” id. at 783, and that the Department’s exclusion of mapping is a permissible interpretation of the statutory text, id. at 785. Nevertheless, that interpretation is far from satisfactory.
First, although the Department reads the Mapping Regulations as written to exclude cochlear implant mapping from the services a school district must provide under the IDEA, the convoluted (and often contradictory) text of the provisions can be fairly read to say the opposite: that is, a school district must provide cochlear implant mapping. Let’s begin with 34 C.F.R. § 300.34, the first of the two challenged Mapping Regulations. It provides an exception to the definition of “related services” that, at first blush, plainly excludes mapping: “Related services do not include a medical device that is surgically implanted, the optimization of that device’s functioning (e.g., mapping), maintenance of that device, or the replacement of that device.” Id. § 300.34(b)(1) (emphases added). But, as is often the case with agency regulations, the next paragraph of that section — paragraph (b)(2) — contains an exception to the exception: “Nothing in paragraph b(l) of this section ... [prevents the routine checking of an external component of a surgically implanted device to make sure it is functioning properly, as required in § 300.113(b).” Id. § 300.34(b)(2). Section 300.34 thus directs us to the second of the two challenged Mapping Regulations — 34 C.F.R. § 300.113 — to determine whether mapping constitutes the “routine checking of an external component ... to make sure it is functioning properly.”
Following this regulatory bread trail, however, reveals very little. Paragraph (b)(1) of section 300.113 provides that “each public agency must ensure that the external components of surgically implanted medical devices are functioning properly.” 34 C.F.R. § 300.113(b)(1). Because mapping ensures that the auditory processor (the external component) of the implant is calibrated so as to send the proper electric signals to the brain, see Pis.’ Compl. ¶ 22,[2] and because mapping is necessary for a cochlear implant to function effectively, see Final Regulations, 71 Fed. Reg. 46,540, 46,569-70 (Aug. 14, 2006) (“[T]he cochlear implant must be properly mapped in order for the child to hear well in school.”), mapping plainly appears to be part of the “routine checking of an external component” of the cochlear implant.
But paragraph (b)(2) of section 300.113 provides an exception to what must be *793 provided under (b)(1). That paragraph provides that “a public agency is not responsible for the post-surgical maintenance, programming, or replacement of the medical device that has been surgically implanted (or of the external component of the surgically implanted medical device).” Id. § 300.113(b)(2) (emphases added). Is cochlear mapping “post-surgical” programming of a surgically implanted medical device? In one sense, yes, as it occurs after (i.e., post) surgery. On the other hand, if the word “post-surgical” is to have real meaning, it must provide some limit to the otherwise all-encompassing exclusionary language.[3] After all, all maintenance, programming or replacement of a medical device that “has been surgically implanted” necessarily occurs after surgery. 34 C.F.R. § 300.113(b)(2) (emphasis added). As we have often explained, judges should hesitate to treat words in a regulation or statute as mere surplusage — words of no consequence. United States v. Project on Gov’t Oversight, 616 F.3d 544, 561 (D.C.Cir.2010). Perhaps, then, “post-surgical” refers to the programming that occurs in the hospital immediately after the child’s cochlear implant surgery.
In short, after tracking two regulatory provisions, two exceptions and one exception to the exception, it is still unclear whether a school district must provide cochlear implant mapping under the IDEA. In the end, much of this uncertainty is legally irrelevant because, as my colleagues note, Majority Op. at 779-80, the Department has consistently interpreted the Mapping Regulations to exclude cochlear implant mapping and we generally defer to the Department’s interpretation of its own ambiguous regulations. See Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (agency’s interpretation of its own regulation has controlling weight unless it is plainly erroneous or inconsistent with the regulation). The Department, and more importantly, children with disabilities, however, would be well served if the Department were to clarify and simplify its regulatory framework. School districts across the nation must interpret the regulations in order to understand their obligations under the IDEA. It does little to advance the educational goals of the IDEA if the Department produces regulations that resist efforts to understand them.
Second, there is a glaring disparity in the Mapping Regulations. It is simply unfair, as the appellants noted at oral argument, that the IDEA does not provide a child born with a severe auditory disability periodic programming of his cochlear implant but that a child with a more moderate disability is entitled to similar periodic programming of a digital hearing aid. See 34 C.F.R. § 300.34(c)(1) (“audiology” includes “[djetermination of children’s needs for group and individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification”).[4] “[The] Congress enacted IDEA in 1970 to ensure that all children with dis *794 abilities are provided a free appropriate public education ... designed to meet their unique needs,” Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 129 S.Ct. 2484, 2491, 174 L.Ed.2d 168 (2009) (emphasis added), not only those children with disabilities that are more easily or cheaply corrected. While I cannot say that the Mapping Regulations are ultra vires in light of the deference we are duty-bound to afford them,[5] they do not, in my opinion, correctly and fairly implement the IDEA.

. It is particularly close in light of both the definition of audiology — "[t]he study of hearing disorders ... as well as the rehabilitation of persons with hearing impairments," Stedman’s Medical Dictionary 169 (27th ed. 2000) (emphasis added) — and the legislative history of the 2004 amendments to the IDEA, see Majority Op. at 788-90.

. To map the implant, the audiologist connects the child’s "microprocessor based speech processor” — the externally worn microprocessor — to a computer that uses special software to measure electrode characteristics and adjust the parameters controlling the stimuli that are delivered to the electrodes within the implant. The Bionic Human, Cochlear Implants 379-385 (Frank E. Johnson et al. eds., 2005). The implant’s speech processor is then programmed according to each electrode’s characteristics (according to the softest and loudest sounds the child can hear comfortably). See id. Once the sound processing parameters for all electrodes have been determined, the computer downloads the information to the implant’s speech processor. See id.

. A six-year-old child has his tonsils removed and twelve years later he graduates from high school. Is his graduation "post-surgical”? Of course not.

. Although a cochlear implant does not amplify sound and thus does not fall within this portion of the definition of "audiology,” a cochlear implant serves the same function as a hearing aid — namely, it enables its user to hear. And just as a digital hearing aid must be periodically programmed in order to function — periodic programming that is provided under the IDEA — a cochlear implant must be periodically programmed, that is, mapped, to "ensure that the external components [microphone and processor] ... are functioning properly.” 34 C.F.R. § 300.113(b)(1). Indeed, the external components are the only components whose functioning can be monitored to ensure the implant’s efficacy.

. As noted by my colleagues, Majority Op. at 782-83, the "related services” exception added to the statute in 2004 — 20 U.S.C. § 1401 (26)(b) — does not expressly exclude cochlear implant mapping. The exception plainly states that "related services” excludes the provision and replacement of surgically implanted devices only. 20 U.S.C. § 1401(26)(b) ("related services” "do[] not include a medical device that is surgically implanted, or the replacement of such device”). It says nothing about mapping and ordinarily we would not presume the Congress intended to exclude any service other than those expressly excluded. See, e.g., Lever Bros. Co. v. Dist. of Columbia, 204 F.2d 39, 41 (D.C.Cir.1953) (under canon of expressio uni-us est exclusio alterius "specific exclusion would seem to indicate that [non-listed] factors should be included within the definition”).